LEWIS, Appellant, vs. CITY OF RACINE, Respondent.
WILSON, Appellant, vs. SAME, Respondent.
LEWIS, Appellant,* vs. SAME, Respondent.
LEWIS, Executrix, Appellant, vs. SAME, Respondent.

*October 13, 1922—January 9, 1923.*

*Income taxes: Profit from sale of corporate stock: Determination
of value: Evidence: Determination of board of review:
Effect: Action to recover unlawful tax paid: Evidence supple-
menting that in record.*

1. In ascertaining the value of corporate stock owned prior to
   January 1, 1911, for income-tax purposes, under sec. 71.02,
   Stats.·1921, requiring payment of a tax on the profit made on
   a sale of stock where the amount realized is greater than the
   fair market value as of that date, the board of review prop-
   erly deducted from the total value of the assets shown by the
   balance sheet the amount of an item designated "Appraisal
   adjustment," entered to reconcile the value of the plant and
   equipment of the company as appraised by appraisers and the
   book values, which exceeded the appraisal by the amount of
   such item.
2. In actions to recover amounts of income tax assessed against
   plaintiffs for alleged profit arising from the sale of corporate
   stock, the court will not overturn the finding of the board of
   review as to the value of the stock unless in no reasonable
   view of the evidence has it any support.
3. Opinion evidence as to the value of corporate stock as of a
   given date, while competent, was not conclusive on the board
   of review if not in harmony with its own judgment.
4. The fact that on July 16, 1916, the entire stock of the corpora-
   tion was sold on a basis of five dollars per share for the com-
   mon stock, and that on said date the net physical assets of the

corporation were less than on January 1, 1911, does not indicate that the value of the stock on January 1, 1911, was greater than five dollars, because, while the net assets were less, the corporation was a going concern in 1916 and other conditions existed which in the opinion of the board might have counterbalanced the difference in assets.

5. The market value of the stock is to be determined from the value of the stock generally, and not from any special value which accrued to the sellers by reason of their majority control.

6. In an action under sec. 74.73, Stats. 1921, to recover an unlawful tax paid, the defendant had a right to introduce evidence supplementing the evidence preserved in the record made before the board of review to show that plaintiffs had paid no more than their equitable share of taxes.

APPEALS from judgments of the circuit court for Racine county: E. C. HIGBEE, Judge. *Affirmed.*

These actions were brought by the several plaintiffs to recover the amount of an income tax assessed against them for an alleged profit or income arising from the sale of stock owned by each of them in the Mitchell-Lewis Motor Company on the 16th day of July, 1916. Identical questions are involved in the actions. They were tried together in the circuit court, briefed and argued here as one action, and will be disposed of in one opinion.

January 1, 1910, two corporations, the Mitchell Wagon Company and the Mitchell Motor Company, were consolidated or merged in a new corporation known as the Mitchell-Lewis Motor Company. The Wagon Company was a large and old-established concern which had been in business since about 1840 and had enjoyed a prosperous business career. The Motor Company was organized in 1902 or 1903 with a capitalization of about $100,000. It had a very prosperous business up to the time of the consolidation. Its business and earnings during that time increased and doubled many times. At and prior to the time of the merger it paid dividends at the rate of about twenty-four per cent. a year. The Wagon Company paid dividends at the rate of about three per cent. or four per

cent. per annum. An audit of the profit-and-loss accounts of the consolidated concerns from July 1, 1908, to June 30, 1911, showed average annual earnings of about $820,000. The consolidated concern was capitalized at $10,000,000, of which $5,000,000 was preferred and $5,000,000 was common stock. The preferred stock was entitled to seven per cent. annual cumulative dividends. The net tangible assets of the consolidated concerns at the time of the consolidation was between three and four million dollars. On January 1, 1911, they were somewhat in excess of $4,000,000.

In the automobile business there is a period when sales are few and manufacturing operations must be carried on to full capacity; that requires large sums of money tied up in materials and goods in process. Up to January 1, 1911, it had been the general policy of the company to invest the surplus mainly in enlargement of the plant facilities. Up to the fall of 1911 the company had been relying upon banking paper to raise the large amount of money which it needed to build the automobiles for the coming season, and then it relied on selling out the product to furnish money to take care of this banking paper. The year 1911 was a poor season for automobile companies generally. At the end of the selling season the company had a considerable portion of its finished product on hand and this made it necessary for it to make a short-time loan of $2,500,000 in November, 1911. At this time the financiers who made the loan took charge of the company's affairs. One Winterbotham was put in as manager by these financiers and under his management serious losses were sustained. It began to get into trouble in 1912, although it made a profit in that year. The trouble existed, though it was not shown outside. There was good strong trouble in the early part of 1912, and early part of 1913 very bad. The losses during 1913 amounted to $500,000, and during 1914 to $1,200,000. During this time they sold the wagon plant for $2,200,000, which was a substantial shrinkage from the amount at

which it was carried on the books of the company. During 1915 the business was better, and during 1916 the business showed a profit of around $500,000. On July 16, 1916, the then stockholders of the company made a sale of all their stock to New York and Chicago bankers for $5,250,000. The amount thus received was apportioned to two groups, known as the majority and minority groups. The majority group, composed of the members of the Lewis family, to which group the plaintiffs belonged, owning 26,100 shares of common and 27,164$\frac{1}{5}$ of preferred stock, received $3,250,000. The minority group, consisting of numerous persons, owning the balance of the stock, received $2,000,000. The majority group apportioned the amount received by them upon the basis of $100 for preferred and $20.45 plus for the common stock. The minority stockholders apportioned the amount received by them $71.64 plus to the preferred and $15.38 to the common stock.

The plaintiffs did not report any profit from this transaction in their income-tax reports for the year 1916. The income-tax board of review was satisfied with the income-tax reports of the plaintiffs in every respect, except their failure to report a profit on this transaction. Upon its own motion the board of review instituted an inquiry as to whether plaintiffs should not be taxed upon a profit resulting from a sale of this stock. At the conclusion of the hearing the board adopted a resolution by which it determined that the value of the preferred stock held by the plaintiffs January 1, 1911, was $100 per share; that the value of the common stock so held by them on that date was $5 per share. They assessed to each a profit of $15.45 a share arising from the sale of the common stock. The plaintiffs severally paid the tax so assessed under protest.

These actions are brought by the respective plaintiffs to recover the amount of the tax so paid, claiming that the same was unlawfully assessed against them. The circuit court affirmed the action of the board of review and entered

judgment dismissing the complaints. From the judgments so entered plaintiffs bring these appeals.

For the appellants there was a brief by *Fawsett & Smart* of Milwaukee, and oral argument by *Edward M. Smart.*

For the respondent there was a brief by *Elmer E. Gittins,* city attorney, and *John B. Simmons* of Racine, of counsel, and oral argument by *Mr. Simmons.*

The following opinion was filed November 8, 1922:

Owen, J. On the 16th day of July, 1916, the plaintiffs sold certain shares of the corporate stock of the Mitchell-Lewis Motor Company owned by them on and prior to January 1, 1911. If the amount realized on the sale was greater than the fair market value of the property as of January 1, 1911, plaintiffs are required to pay an income tax upon such profit or gain under the provisions of the income tax act, sec. 71.02, Stats. The board of review held there was such a profit, and these appeals present the narrow question whether in any reasonable view the evidence furnishes a substantial basis for the conclusion of the board, as, if so, and there is nothing to show that it acted arbitrarily or dishonestly, its decision will not be set aside. *State ex rel. Walthers v. Jung,* 175 Wis. 58, 183 N. W. 986; *State ex rel. Althen v. Klein,* 157 Wis. 308, 147 N. W. 373; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 100 N. W. 1048. There is no dispute as to the amount for which the stock was sold, leaving only to be solved the question of the fair market value of the stock as of January 1, 1911. There is no evidence of sales of the stock at or about January 1, 1911, to which reference may be had for the purpose of establishing the market value of the stock at that time, except in three isolated instances, which will be adverted to later.

"In the absence of a known market value, the proper method of establishing the value of corporate stock is by proof of its actual value." *Will of Porter,* 178 Wis. 556,

190 N. W. 473, and authorities there cited. The evidence produced before the board of review was calculated to show the actual value of the stock as of January 1, 1911, and consisted, generally speaking, of a statement of the financial condition of the corporation, its then earning capacity, together with some opinion evidence as to the value of the common stock at that time. It may be said here that the preferred stock is conceded to have been worth par January 1, 1911, as well as January 16, 1916, when the sale occurred. The controversy, therefore, is confined wholly to the value of the common stock as of January 1, 1911.

A balance sheet of the company, prepared by Arthur Young & Company, certified public accountants, as of June 30, 1911, shows total footings of $13,378,719.44. To make this total there is included on the asset side $5,180,000.84 under the item of "good will." There is included also $394,090.69 under the item "appraisal adjustment." This item seems to have arisen from the fact that Messrs. Coats & Burchard appraised the plant and equipment of the company as of June 30, 1911, which appraisal fell short of the book values by the amount of this item. Evidently the balance sheet shows the appraised value, and this item is inserted for the purpose of reconciliation. It is an item which in our opinion the board of review had a right to deduct from the total value of the assets of the company.

A profit-and-loss statement, prepared by the same public accountants, shows the profit during the six months prior to June 30, 1911, to have been $338,421.14. In order to ascertain the net value of the assets as of January 1, 1911, this item should be deducted. The amount of liabilities to be deducted for the purpose of ascertaining the value of the net assets is $3,203,981.50. A deduction of these items from the total listed assets leaves $4,262,225.27, the book value of the net assets of the company as of January 1, 1911. Against this there was outstanding $5,000,000 of

preferred and $5,000,000 of common stock. Upon this showing the board of review determined that the preferred stock was worth par and that the common stock was worth $5 per share on January 1, 1911. This is equivalent to saying that the entire outstanding stock was of the value of $55 per share, approximately seventy-seven per cent. of which is represented by tangible assets and twenty-three per cent. by intangible assets in the nature of good will, etc.

This determination by the board is assailed by the appellants as entirely unjustified, and we will now consider the evidence relied on to impeach its finding. *G. B. Wilson,* one of the plaintiffs, testified that the fair market value of the common stock January 1, 1911, for the purposes of control, and taking into account the good will and record of earnings and of future prospects of the company, was at least $40 per share. F. Lee Norton, an apparently disinterested witness, testified that in his opinion the common stock on January 1, 1911, was worth $40 per share. He stated that the value was in the voting power. It perhaps should be stated at this time that the common stock of this corporation had the exclusive voting power. While this testimony was competent (*Erd v. C. & N. W. R. Co.* 41 Wis. 65; *Murray v. Norwood,* 77 Wis. 405, 46 N. W. 499) it was by no means conclusive. It was the opinion of these men based on evidence which the board had before it and concerning a matter upon which the board was as competent to judge as were the witnesses. Conceding that this opinion evidence was entitled to the consideration of the board, it was not conclusive on the board if not in harmony with its own judgment. *Mr. Wilson* further testified as follows:

"I think the balance sheet of the company as of January 1, 1911, did not show any book value for the common, although that is only my recollection, but nevertheless the common stock I considered at that time had a considerable value towards voting power."

And again he testified:

"At that time I considered the value the common stock had was in the control of the company. I would say the condition would be substantially the same either on January 1, 1911, or in 1916. Such value as the common stock had was the value that attached to the majority of the common stock as carrying the control."

Mr. Fawsett, attorney for the plaintiffs, in a statement to the board said:

"There was never any asset value that could be attributed to the common stock during any portion of that period. The common stock for those reasons could never be considered as having any asset value. Certainly nothing more than a highly speculative one. The group of stockholders who owned a majority of the common stock and who thereby had the control of the corporation would regard it as of value, and any one purchasing the stock for the purpose of getting control, it would be of value to them for that purpose, and I should say for that purpose only. Really never was considered that the common stock had any actual value aside from the control which it carried at the time the sale was made in determining the amount the Lewises would take for their interests."

Actual sales were shown as follows: On April 10, 1910, W. T. Lewis sold to Eliza A. Wallace 450 shares of the preferred stock of the company for 450 shares of the common stock. It was a part of the agreement of this sale that if during the actual lifetime of Eliza Wallace the annual dividend declared by such corporation on its common stock shall exceed seven per cent., then and in that case the excess of said dividend over and above seven per cent. shall be paid to said Eliza Wallace. In view of the fact that this sale was made April 10, 1910, at a time when the net assets of the company were even less than they were on January 1, 1911, and in view of the fact that no one has at any time contended that the common stock was worth par, or was of equal value with the preferred, the board of

review may have well considered that there was some un-disclosed consideration for the transaction, and they were entirely within their province if they did not regard the transaction as having a serious bearing upon the actual value of the stock. It also appeared by the affidavit of *William Mitchell Lewis* that in May, 1911, he sold to his father, W. T. Lewis, 1,000 shares of the preferred stock at $100 a share and 1,000 shares of the common stock at $40 a share. It was also shown that during the winter of 1912 and 1913 White, Weld & Company sold 2,000 shares of the common stock at about $10 a share. It appears, however, that this stock was bought by the company itself, converted to its treasury and later presented to Mr. McLaren, who became president and general manager of the company in 1913. Mr. McLaren himself testified that he did not consider the stock as of any value at the time it was presented to him.

Here we have evidence of three stock transactions. In one the common stock sold for $10 a share, in the other for $40 a share, and the third transaction amounted to an even trade of common for preferred stock. These transactions, as a whole, do not constitute very substantial evidence of the market value of the stock as of January 1, 1911, and were entitled to very little if any weight in arriving at a determination of that question.

Probably the strongest argument made by appellants to indicate an erroneous determination by the board of review lies in the fact that on July 16, 1916, at a time when the net physical assets of the company were $3,790,551, an actual sale of all of the stock of the company was made for $5,250,000. This would represent par for the preferred stock and $5 per share for the common, being the amount at which the board of review valued the stock as of January 1, 1911. It is said that this sale shows the actual value of the stock July 16, 1916, and that if the common stock was worth $5 per share on that date it must have been worth

more than $5 per share January 1, 1911, when the net physical assets of the company were approximately $470,000 greater than in 1916. This would be a telling argument if the company were in the course of liquidation and the proceeds to be derived from the physical assets constituted the only element of value. However, the corporation was a going concern July 16, 1916, and while the net assets were considerably less, other conditions existed which, in the opinion of the board, might have counterbalanced this difference in the amount of the assets. Moreover, the shrinkage in assets could affect only the preferred stock, and while there were less real assets back of the preferred stock in 1916 than in 1911, nevertheless the preferred stock had an additional element of value in 1916, at the time of the sale. No dividends had been paid on the stock for four years and nine months, and, as the dividends were cumulative, the par value of the preferred stock in 1916 was really $1.33 per share. Notwithstanding a shrinkage in the net assets, the company had re-established itself in a secure financial position, and during the year preceding the sale had earned approximately $500,000, a sum sufficient to pay a ten per cent. dividend on the preferred stock. This condition reasonably justified the belief that the earning power of the company was sufficient not only to resume payment of the actual dividends on the preferred stock, but also to wipe out the accumulated dividends in the course of a few years. While the net assets of the company had shrunk something like $470,000, the current indebtedness of the company had been reduced from approximately $3,000,000 in 1911 to approximately $1,580,000 at the time of the sale. In addition to this, the board probably did not shut its eyes to the fact that a wave of business prosperity had set in at that time, due to the world war, especially in view of the testimony of *Mr. Wilson* to the effect that "you should also bear in mind that in July, 1916, the public feeling was very good with reference to motor stock. The public would buy

motor securities at that time and that was at its height along about that time, or nearly so."

The board might well have concluded that even though the physical assets of the concern were less in 1916 than in 1911, nevertheless the actual value of the stock, all elements of value considered, was just as great in 1916 as in 1911. The record before the board of review disclosed with practical unanimity that the value attaching to the common stock was merely the value resulting from the control of the corporation. There is no reason to perceive why that value was not just as great in 1916 as in 1911. The sale price of 1916 would indicate that it was $5 per share. The board of review concluded that that also was its value in 1911, and we discover nothing in the way of a mathematical demonstration that it was any different. The fact is that the value of the common stock at all times rested in the sound judgment of men. Mr. Gillen, testifying in behalf of the plaintiffs, said that "no two men would agree on the price of the stock at any given time." To overturn the finding of the board of review it must be held that in no reasonable view of the evidence has it any support. This, in our judgment, has not been established.

Plaintiffs, owing to their majority control, were enabled to secure more than their due proportion of the sale price of the entire stock. They secured par for their preferred, and something in excess of $20 per share for their common, stock. It is said that this incident in and of itself shows that their common stock was worth more than the stock generally. While this may be true as a practical proposition, we cannot indorse it as a legal proposition. The market value of the common stock of this company January 1, 1911, is the basis upon which plaintiffs' income tax is to be assessed, and that market value is to be determined from the value of that stock generally and not from the special value which accrued to plaintiffs by reason of their majority control. Neither can we say that the fact that plaintiffs

released all claims which they might have had for mis-management against those who were in control of the company during the period from 1911 to 1916 constitutes a material consideration. Whatever value there was to these claims was incident to the stock and grew out of the ownership of the stock. At any rate, the simple fact remains that they sold certain shares of stock in 1916 for $20 a share which on January 1, 1911, were of the actual value of $5 per share. This represents a clear profit of $15 per share on their respective holdings, and it matters not how they were enabled to make this profit, or what circumstances conspired to enable them to make the advantageous sale. It represents profits growing out of the sale of the stock and is properly assessable as income.

While in view of the conclusion already reached it does not affect the result, there remains a question of practice to be considered. The respondent, at the trial, claimed the right to introduce evidence supplementing the evidence preserved in the record made before the board of review in further support of the findings of the board. The court excluded such evidence and ruled that the sole question was whether the board of review acted within its jurisdiction, which, under the circumstances, presented the question whether there was any evidence to support its findings. This action is brought under sec. 74.73, Stats., formerly known as sec. 1164. This section confers a right of action for the recovery of an unlawful tax. The trial court took the position that whether this was an unlawful tax depended upon whether there was evidence to support the findings of the board of review, and that question was to be determined by an examination of the record made before the board of review. This was no doubt correct so far as a determination of the question whether the tax was unlawful was concerned. The section authorizing this action, however, provides: "No action shall be maintained under the provisions of this section unless it shall appear

that the plaintiff has paid more than his equitable share of such taxes." Now it might very well be that the evidence introduced before the board of review was not sufficient to support its action, but that, nevertheless, sufficient evidence in that behalf could be produced upon the trial of this action. Such a situation would establish the illegality of the tax but show that plaintiffs paid no more than their equitable share of taxes. Under such circumstances plaintiffs should be denied relief.

In the case of *Day v. Pelican,* 94 Wis. 503, 69 N. W. 368, plaintiffs made a return to the assessor disclosing their ownership of certain saw-logs, but not stating the quantity, valued at $8,250, as being all of their personal property liable to taxation in the defendant town. This valuation was raised by the assessor or board of review to $30,750, without notice to the plaintiffs, upon which amount a tax was levied. Plaintiffs paid the tax under protest and brought an action under sec. 1164, Stats., to recover the alleged illegal portion thereof. The town replied that, as a matter of fact, the plaintiffs owned property to the amount of the assessment and that they had paid no more than their just share of taxes in the town. The court held that the statute "applies the rule in equity in respect to relief on account of illegality in the assessment and collection of taxes, denying all relief unless it is made to appear that the tax proceedings are not only illegal and void, but that they are inequitable." As the evidence showed that plaintiffs' assessment was not inequitable, though it was illegal, recovery was denied.

It is clear that in the instant case respondent should have been permitted to show, if it could, that even though the board of review did not have sufficient evidence before it to justify its conclusions, nevertheless the plaintiffs had paid no more than their equitable share of taxes. The evidence should have been received, but in view of the fact that the record made before the board of review discloses

Milwaukee Western F. Co. v. Industrial Comm. 179 Wis. 223.

sufficient evidence to support its conclusions, the error aris-
ing from the exclusion of the testimony is immaterial. It
follows from the foregoing that the several judgments ap-
pealed from should be affirmed.

*By the Court.*—Judgments affirmed.

A motion for a rehearing was denied, with $25 costs, on
January 9, 1923.