Estate of Nieman : Sammond and others, Appellants, vs. Tax Commission, Respondent.

*December 5, 1938—January 10, 1939.*

For the appellants there were briefs by *Miller, Mack & Fairchild,* attorneys for the administrators, c. t. a. of the estate of Lucius W. Nieman, deceased, and for the executors of the last will and testament of Agnes Wahl Nieman, deceased, and by *Shea & Hoyt,* attorneys for Faye McBeath, and oral argument by *J. Gilbert Hardgrove, T. C. Bollinger,* and *Edmund B. Shea,* all of Milwaukee.

For the respondent there was a brief by the *Attorney General, N. S. Boardman,* assistant attorney general, *Neil Conway,* inheritance tax counsel, and *Albert B. Houghton,* public administrator of Milwaukee county, and oral argument by *Mr. Boardman, Mr. Conway,* and *Mr. Houghton.*

FOWLER, J.   As appears from the preceding statement the case involves an inheritance tax which was computed on the market value of stock transferred by the will of the testator at the time of the testator's death as determined by the court and without deducting the amount of the federal estate tax imposed on the same transfer of the stock.   The contention of the appellants is that the tax should have been computed on the value of the property actually received by the beneficiaries, because one cannot be taxed on anything he does not receive.   On this hypothesis, the appellants rest two propositions,—that the beneficiaries of the stock transfer cannot be taxed on the amount of the federal tax because they never received it, and that to hold otherwise would render the inheritance tax statute void as depriving the beneficiaries of property without due process and denying them equality before the law.

The tax involved was imposed pursuant to sec. 72.01, Stats., which imposes a tax "upon any transfer of property, real, personal or mixed, or any interest therein, . . . (1) when the transfer is by will." Sec. 72.01 (8), Stats., reads that "The tax so imposed shall be upon the clear market value of such property at the rates hereinafter prescribed and only upon the excess of the exemptions hereinafter granted."

It was held in 1919 in *Estate of Week,* 169 Wis. 316, 172 N. W. 732, that the valuation to be taken as the basis of computation of the inheritance tax is the clear market value of the inheritance as of the instant of the decedent's death. That ruling has been adhered to ever since, and was reiterated in *Will of Kootz,* 228 Wis. 306, 280 N. W. 672. In the *Kootz Case* the question was carefully reconsidered. We will not go over any of the matters discussed in the opinions in either of those cases. There is now raised the question of the constitutionality of the statute which we declined to consider directly in the *Kootz Case* because it was not raised by the appellants therein, although it was urged by counsel for the appellants herein in a brief filed as *amici curiæ.* We will here pass upon the question of constitutionality.

The constitutional argument of appellants' counsel may be briefly stated as follows: No executor or administrator can pay any other debt until the debts due the United States out of the estate are paid; U. S. Code, title 31, ch. 6, secs. 191 and 192; the estate tax must be paid before the estate is distributed; title 26, sec. 426 (b); the word "debts" includes taxes; *Price v. United States,* 269 U. S. 492, 46 Sup. Ct. 180, 70 L. Ed. 373, and because the federal estate-tax law is constitutional and therefore the supreme law of the land the taxes thereby imposed take precedence over the taxing power of the state. *Florida v. Mellon,* 273 U. S. 12, 17, 47 Sup. Ct. 265, 71 L. Ed. 511. Being a debt the federal tax must be deducted just as any other debt of the decedent is

deducted. The recipient does not receive the amount of the federal tax any more than he receives the amount of the other debts of the decedent, and to tax him on what he does not receive, is not due process.

It is quite true that, generally speaking, as illustrated in bankruptcy or receivership proceedings, a tax due from the bankrupt or debtor to the United States is a debt, and so in the federal estate-tax proceedings is an income tax or other species of unpaid tax imposed on a decedent by the United States prior to his death. But the federal estate-tax statute, title 26, sec. 413 (b), provides that a state inheritance tax actually paid by a resident of a state may be deducted from the federal estate tax on the inheritance. In the face of this it can hardly be contended that the ruling of *Florida v. Mellon, supra,* if as stated, so applies as to compel a state to defer the payment of such a tax until after the federal estate tax is paid, or in any way to give precedence to the federal over the state tax. It is true that if the state inheritance tax were a tax on property received there would be discrimination violative of the Fourteenth amendment as illustrated by the following supposititious case: Each of two persons actually receives from different testators the same sum of money. A's testator leaves an estate of $1,000,000, on which the federal estate tax is $183,000. A's bequest is the residue of the estate which after payment of the other bequests and the federal tax yields him $40,000. B's testator leaves an estate of $40,000 and leaves it all to B. B's tax on the $40,000 received is $1,300. A's tax is on the $183,000 federal tax plus the $40,000 received and is $16,700. If a property tax this would of course be discriminatory. But the state inheritance tax is not a tax on property received. It is a transfer tax, a tax on the right to receive property by inheritance, as pointed out in the *Week* and *Kootz Cases, supra,* and many other cases in this court, and it may be im-

posed on whatever basis the state sees fit to impose it. The constitutionality seems to us to be established by *Frick v. Pennsylvania* (1925), 268 U. S. 473, 498, 45 Sup. Ct. 603, 69 L. Ed. 1058. That case involved a Pennsylvania statute providing that in computing the state inheritance tax the federal estate tax should not be deducted. In considering the constitutionality of the provision the supreme court of the United States says:

"While the federal tax is called an estate tax, and the state tax is called a transfer tax, both are imposed as excises on the transfer of property from a decedent and both take effect at the instant of transfer. Thus both are laid on the same subject, and neither has priority in time over the other. Subject to exceptions not material here, the power of taxation granted to the United States does not curtail or interfere with the taxing power of the several states. This power in the two governments is generally so far concurrent as to render it admissible for both, each under its own laws and for its own purposes, to tax the same subject at the same time. A few citations will make this plain. In *Gibbons v. Ogden*, 9 Wheat. 1, 199, Chief Justice MARSHALL, speaking for this court, said: 'Congress is authorized to lay and collect taxes, etc., to pay the debts, and provide for the common defense and general welfare of the United States. This does not interfere with the power of the states to tax for the support of their own governments; nor is the exercise of this power by the states an exercise of any portion of the power that is granted to the United States. In imposing taxes for state purposes, they are not doing what congress is empowered to do. Congress is not empowered to tax for those purposes which are within the exclusive province of the states. When, then, each government exercises the power of taxation, neither is exercising the power of the other.' . . .

"With this understanding of the power in virtue of which the two taxes are imposed, we are of opinion that neither the United States nor the state is under any constitutional obligation in determining the amount of its tax to make any deduction on account of the tax of the other. With both

the matter of making such a deduction rests in legislative discretion. In their present statutes both direct that such a deduction be not made. It is not as if the tax of one, unless and until paid, presented an obstacle to the exertion of the power of the other. Here both had power to tax, and both exercised it as of the same moment. Neither encroached on the sphere or power of the other. The estate out of which each required that its tax be paid is much more than ample for the payment of both taxes. No question of supremacy can arise in such a situation. Whether, if the estate were not sufficient to pay both taxes, that of the United States should be preferred (see *Lane County v. Oregon,* 7 Wall. 71, 77), need not be considered. That question is not here involved."

This is the last word of the United States supreme court that we find bearing upon the constitutionality of the construction given to our statute by the *Week* and *Kootz* decisions. Counsel suggests that if there is any "doubt" that one construction of a statute is unconstitutional and another construction is constitutional the latter should be given. This may be conceded. But the *Frick Case* seems to us to remove all possible doubt of the constitutionality of the construction twenty years ago given to the instant statutes. To the same effect as the *Frick Case* is *Stebbins v. Riley,* 268 U. S. 137, 45 Sup. Ct. 424, 69 L. Ed. 884.

The above seems to us to cover sufficiently the contention of the appellants as to the unconstitutionality of our inheritance tax statute as we have construed it for twenty years. If including the federal estate tax which the beneficiaries did not in fact receive in the base of computation of the state tax does not render the administration of the statute unconstitutional, neither does the fact that the beneficiaries did not actually receive the difference between the $4,500 per share of the stock fixed by the court in the tax proceedings and the $3,500 per share actually received by them render its administration unconstitutional.

But appellants also contend that the determination of value made by the county court in the tax proceedings cannot stand because, (1) the value fixed by Judge McDONALD when he approved the sale of the stock is *res judicata;* (2) in any event the actual sale of the stock fixed its value; (3) the finding is contrary to the great weight and clear preponderance of the evidence; (4) the county court based its judgment on erroneous views of the law in three respects: (a) The court considered as evidence the value of $5,000 per share fixed by the appraisers of the estate in preparing the inventory; (b) considered the offer of $4,250 per share of Mr. Annenberg hereinafter referred to; and (c) the opinion of value given by one of the witnesses for the state upon which the court relied was not receivable as he was incompetent to form or give an opinion as an expert. These contentions will be briefly discussed.

(1) We consider it sufficient to say upon this point that the finding of Judge McDONALD was not *res judicata* because the state or its taxing authorities were not parties to the hearing before him.

(2) The sale of the stock did not conclusively fix its value because of the circumstances under which it was made. The only offer considered or sought was that of the Journal Company and Miss McBeath. Mrs. Nieman's will gave the residue of her estate to Harvard University, her will had been held valid when the hearing was had, and the university and Miss McBeath were the only ones appearing at the hearing of the petition for approval of the sale who had any interest in the price received. Both of these assented to the sale at $3,500 per share and so did Harvard University. Mr. Grant, manager of the Journal Company, and the owner of four hundred of the nine hundred outstanding shares of the stock of the Journal Company, and the owners of the other five hundred shares of stock desired that the $3,500 offer of the

Journal Company and Miss McBeath be accepted. All these being satisfied with that price the court was not concerned with the price at which the stock might have been sold. Its only concern was whether the sale was to parties who would carry out the wishes of Mr. Nieman as expressed in his will as to the policies of the paper as established and followed by him and who would meet the responsibilities of a newspaper as he conceived them. Four efforts were made by others than the purchasers toward purchasing the stock, to none of which the trustees who were charged with the sale of it paid any attention. Mr. Spence told the trustees shortly after Mr. Nieman's death that he had a client who would be interested in purchasing the stock and desired to open negotiations with them. Neither then nor thereafter was opportunity to negotiate extended to him. Mr. Annenberg made an offer of purchase, and requested opportunity to go through the plant. His request to go through the plant was denied, and no inquiry was made whether he or those he represented would carry out the policies and uphold the ideals of Mr. Nieman in conducting the Journal if the stock were sold to him, and no opportunity to negotiate was extended to Mr. Annenberg then or thereafter. No investigation was made as to his ability to pay the price offered, nor was it questioned. A definite offer was twice made by Mr. Annenberg, and was again renewed in his behalf at the hearing before Judge McDonald and was again ignored. Even if the amount of the offer of Annenberg was not receivable as evidence of value, his offers and his efforts were admissible on the question whether as good a price was secured for the stock as might have been procured if efforts had been made to procure a higher one. Effort was made by the trustees by inquiries of newspapermen and as to newspaper sales, to ascertain what would be a fair price for the stock, but it was made to determine whether the offers of Mr. Grant, origi-

nally $2,500 and afterward raised to $3,500 would pass muster as a purchase price rather than what could be procured for the stock. They were not obligated to procure the highest price obtainable. Their duty was fulfilled by selling to persons who would best carry out the policies and wishes of Mr. Nieman as expressed in his will. We consider that under all the circumstances involved the sale price procured should not be considered as establishing the market value of the stock.

It is of moment in this respect that the appellants' counsel in their opening statement on the trial below stated:

"Now, of course, it is not our claim that that sale established the market value nor that that judgment established the market value, but it is our claim that that establishes the fair and proper sale made under the terms of that will and at a proper price made under the terms of that will."

(3) Careful consideration of the court's findings and written opinion taken together seems to us to indicate quite clearly that the main factors in the court's evaluation of the stock was its great earnings and the testimony of Mr. Chapman, an accountant of the Tax Commission who the court stated in its opinion "made a very good impression upon the court, giving facts and figures and experiences that he had and instances that he knew of in the sale of other papers" who fixed the value at $4,700 per share. The Journal Company's earnings for the ten years next prior to the sale were over $9,250,000, an annual average of nearly $928,000. These annual earnings average 32.67 per cent of the capital invested and during the period never fell below 20.85 per cent in any year. It appears by the testimony of Mr. Chapman that his methods of estimating value were based upon an article in the "Editor & Publisher" a "newspaper for newspapermen," according to the testimony of Mr. Brown, its "principal owner and president" (who testified as an ex-

pert for the appellants), and generally considered as an authority on appraising newspaper values, that there are four "thumb-nail rules" for evaluating the "good will" and net values of newspapers. Tested by three of those rules, the value of the stock of the Journal Company was higher than the appraisal of $4,700 per share made by Mr. Chapman. Mr. Brown, the appellants' expert referred to, by using the one of those methods based upon circulation, arrived at a valuation of $3,163 per share by adding what he designated as "the accepted formula of $10 per subscriber" to the book value of the stock. The method of Mr. Brown leaves out of consideration the earnings of the radio station owned by the Journal Company, which, although at first operated at a loss, in 1936 earned $176,659, and if capitalized at six per cent on that year's earnings would add $1,472 per share to the value of the stock and increase its value to $4,635, $135 per share more than the value fixed by the court. It is worthy of note that the method used by Mr. Brown was characterized by Mr. Chandler, another witness produced by appellants as "frankly silly and absurd." By using any one of the other three methods given in the article referred to the value of the stock would be nearly equal or exceed the amount of Mr. Chapman's appraisal. In view of the characterization of the method used by Mr. Brown by the appellants' witness Chandler, the court can hardly be blamed for not accepting his appraisal. The value as arrived at by Mr. Chapman according to the other three methods of valuation would be $4,691, $5,584, and $4,825 per share, every one of which exceeds the value of $4,500 per share fixed by the court.

One of the accepted methods of evaluating a business is the "going concern" method. That method has been accepted by this court: *Wisconsin Gas & Electric Co. v. Tax Comm.* 221 Wis. 487, 495, 498, 266 N. W. 186, 268 N. W.

121; *State v. Pullman Co.* 178 Wis. 240, 260, 189 N. W. 543; *State v. Pabst,* 139 Wis. 561, 121 N. W. 351. It takes the average net annual earnings for a series of years sufficiently long to establish stability of earnings and fixes capitalization value by using such annual rate of earnings as is deemed proper for the business. Taking the Journal Company's earnings for ten years and capitalizing the business on such basis the Journal stock would be worth: At 6%, $8,741.71; at 7%, $6,808.50; at 10%, $5,648.57; at 12%, $4,875. Capitalization at six per cent was held "not too low" in the *Wisconsin Gas & Electric Co. Case, supra,* and six and one-half per cent was held "properly used as a guide" in the *Pullman Co. Case, supra.* We are unable to see that upon the whole evidence the court's valuation of $4,500 per share is excessive. It is of course true that no witness gave that precise valuation. The testimony of the witnesses who gave the value at less than the stock was actually sold for was pretty thoroughly discredited by the fact of a sale without permitting competition at $3,500 per share. The court might, according to its judgment, fix the value anywhere between that and $4,700 per share, the highest value at which any expert placed it. The court considered the testimony of this witness fair and credible. The appellants can hardly complain that the court fixed the value at $200 less than this witness. The court stated it was its opinion "that resolving all doubts in favor of the taxpayers, the fair market value of the stock of the Journal Company on the date of the death of Mr. Nieman was $4,500 per share." The difficulties of evaluating stock of large corporations of great earnings is well illustrated by the variety of opinions and methods used by the various witnesses. It is referred to in the three cases of this court above cited. The difficulties in cases of newspapers are especially great. The opinion of somebody must finally prevail, and the value having been fixed by a court,

its finding cannot be disturbed unless it is contrary to the "great weight and clear preponderance of the evidence." We consider that the valuation of the county judge must be sustained if he was justified in relying on the testimony of Mr. Chapman. Whether he was is more particularly considered, *infra,* under heading (4) (c).

(4) (a) In his written opinion filed the county judge referred to the fact that the stock had been appraised by the appraisers of the estate at $5,000 per share. Whether this was considered by him as affirmative evidence of market value or only as reason for not taking the actual sale price of the stock as conclusive evidence of value does not clearly appear. The ordinary procedure in inheritance tax proceedings is to accept appraised value as the basis of computation unless there is objection. The court's statement is that the administrators objected to taking the appraised value as the basis and insisted that the market value should be taken as the basis. Counsel for appellants say in their brief: "It does not appear from the findings herein that any importance was attached by the court to that appraisal as evidence of value," and that they urge the point only because the respondents by motion to review ask the court to fix the value of the stock for inheritance tax purposes at $5,000 per share, the amount fixed by the appraisers. In this situation we will postpone discussion of the admissibility of the appraisal until we take up the motion for review.

(4) (b) Mr. Annenberg made an offer of $4,250 per share for the stock. It is contended by appellants that the trial court considered this offer as evidence of market value of the stock and there should be a new trial for that reason. That the court did not accept it as establishing value is manifest from the finding made. It doubtless was considered as tending to show that the sale price was not conclusive of its value. But as the evidence of Mr. Chapman and the earnings

of the company in our opinion sufficiently support the finding of the court it seems plain that even if not receivable on the question of market value, its receipt should not work reversal. But as to its receivability we will say that there is nothing in evidence to indicate that the value of the stock was any different at the time of Mr. Nieman's death than at the time the offer was made. If the offer was receivable as evidence of value at the latter time, it was receivable as evidence of the value at the former. The best evidence of market value of stock doubtless is the market quotation at the time involved, if the stock is quoted on the market. But the Journal stock was not on the market for sale. Likewise actual *bona fide* sales are evidence of its value. But Journal stock was not sold. It was held by two persons and other persons so allied in interest as to constitute a unit. Thus the most acceptable methods of determining market value were not available, and the court had to take such evidence of probative weight as was available. The question is, Did the offer have probative weight under the circumstances?

The market value of the stock at the time of the testator's death is what it would have sold for at that time upon negotiations resulting in sale as between a purchaser able and desiring to buy and an owner willing to sell. Whatever has any probative force toward determining that price is receivable in evidence to determine it. It is true that this court has held in condemnation proceedings that offers to purchase property are not receivable as evidence of its market value, because they are apt not to be *bona fide,* but made or procured for evidentiary purposes merely rather than in an attempt to negotiate an actual sale, and the United States supreme court has so held. *Atkinson v. Chicago & N. W. R. Co.* 93 Wis. 362, 67 N. W. 703; *Watson v. Milwaukee & Madison R. Co.* 57 Wis. 332, 350, 351, 15 N. W. 468; *Sharp v. United States,* 191 U. S. 341, 24 Sup. Ct. 114, 48

L. Ed. 211. However, offers of purchase made have been received as evidence of value when made with actual intent and pursuant to actual effort to purchase. *German-American State Bank v. Spokane-Columbia R. R. & Nav. Co.* 49 Wash. 359, 95 Pac. 261; *Jefferson Park Dist. v. Sowinski,* 336 Ill. 390, 168 N. E. 370; *City of Kalamazoo v. Balkema,* 252 Mich. 308, 233 N. W. 325; *Perkins v. People,* 27 Mich. 386; *Chaney v. Coleman,* 77 Tex. 100, 13 S. W. 850; *O. C. Crittenden & Co. v. North British & Mercantile Ins. Co.* (5th Cir.) 31 Fed. (2d) 700; *Wiget v. Becker* (8th Cir.), 84 Fed. (2d) 706. The three cases last cited are conditioned on proof being made of ability to pay, and no such proof was here made. It would seem that if this condition were met an offer of purchase should be received if *bona fide* intent and attempt to purchase also appeared. Whether the offer, strictly speaking, was evidence of value or not, it is to be noted that it was offered by appellants. Having offered it themselves it would seem that it hardly lies for them to say that it should not be considered by the court as evidence of whatever material fact the court deemed that it tended to prove. The general rule seems to be that where a party has introduced an item of evidence "he cannot subsequently object that it should not have been received, or that it should not be given such consideration as its natural probative value entitled it to." 23 C. J. p. 51. It is true it does not expressly appear that Annenberg was financially able to fulfil his offer, which was a cash offer, nor does it expressly appear that he would carry out the policies of Mr. Nieman and fulfil the obligations of a newspaper as Mr. Nieman conceived them. But neither does it appear that he could not or would not do both. Appellants say that the offer should not be considered because Mr. Annenberg was not present for cross-examination as to his abilities and intentions in this respect. The respondents are not chargeable with not having him present, as they did not put his offer in evidence in the first

instance. Upon the whole we are of opinion that the trial court might properly consider the offer as having probative force upon the question of value, to such extent as it appears that he considered it.

(4) (c) The appellants go so far in their criticism of the testimony of Mr. Chapman to whose opinion the court gave more weight than to that of any other witness produced, as to urge that his opinion was not receivable in evidence as an expert because he had not had any experience in buying or selling newspapers and his information as to sales concerning which he testified was based wholly on hearsay. In support of this proposition *State ex rel. Park Falls L. Co. v. Stauber,* 190 Wis. 310, 207 N. W. 409, is cited. It must be conceded that if everything that is said by the court in the opinion in that case is taken at its face and considered applicable to every conceivable situation, the appellants go far toward throwing Mr. Chapman and his evaluation out of the window. But we consider the broad generalities of this case were very largely circumscribed by the decision in *State ex rel. Flambeau Paper Co. v. Windus,* 208 Wis. 583, 243 N. W. 216. The witnesses who were held incompetent in the *Park Falls Case* were so held because they did not come one hundred per cent up to the general conditions of qualification, as stated at pages 315 and 316 of the opinion:

"The two witnesses, Laidlaw and Halbert, did not possess sufficient knowledge of the subject matter, viz., the private sale value of lumber-mill equipment, to qualify them as competent witnesses. 2 Jones, Evidence (3d ed.), § 368. As stated by that learned author at section 387, the essentials are two: A knowledge of the intrinsic properties of the thing; a knowledge of the state of the markets. As stated by Wigmore (2d ed.), § 717, 'where there is a market value, the knowledge of the witness must be of this market value.' *Berg v. Spink,* 24 Minn. 138. Such knowledge must generally be acquired by personal observation, not by mere hearsay. 1 Wigmore, Evidence (2d ed.), § 719; *Kost*

*v. Bender,* 25 Mich. 515, 519; *Detroit v. Fidelity R. Co.* 213 Mich. 448, 455, 182 N. W. 140, 142."

Let us consider whether or how near Mr. Chapman measured up to the qualifications there stated. As to knowledge of the "subject matter," he certainly made great and painstaking effort to qualify himself in this respect,—as much as Mr. Luhman or Mr. Mack, upon whose evaluation of $3,500 the appellants confidently rely, both in "knowledge of the intrinsic properties of the thing sold" and a "knowledge of the markets" so far as newspapers can be said to have a market. "Where there is a market value, the knowledge of the witness must be of this market value." There was no market value of the stock of the Journal Company in the sense that market value is used in the above quotation. "Such knowledge must generally be acquired by personal observation, not by mere hearsay." Again, Mr. Chapman's knowledge was acquired by hearsay just as was that of Mr. Luhman and Mr. Mack. And the quotation last above does not imply that it must always be acquired by personal observation, but only generally. The implication is that it may under some circumstances be acquired through hearsay. The knowledge of the opinion witness in the *Flambeau Paper Co. Case, supra,* as to sales, sales prices, etc., was so acquired. We consider that the evaluation of Mr. Chapman was competent, and the court was entitled to give it such weight as it considered it to be entitled to. Appellants also urge that it should be wholly rejected because he considered the fact that the stock sold constituted a majority of the stock of the corporation and carried with it control of the corporation, and that he did not consider that the value of the stock depended largely on whether the purchaser could secure continuance of the services of Mr. Grant as manager of the corporation, which counsel for appellants urge as the controlling factor in evaluating the stock. This, however, goes only to the weight to be given to his opinion, to the

amount, if any, by which it should be discounted, not to its rejection in toto. But as to its merits it appears to us that if the continuance of the services of Mr. Grant was a fact bearing on the value of the stock, so was the fact that the block of stock sold constituted a majority of the stock of the company, and that, conversely, if the latter is immaterial, so is the former. The two seem to us to be on precisely the same basis. In arguing that the one is material counsel refute their argument that the other is immaterial. In support of their contention that the fact that the block sold constituted a majority of the corporate stock was immaterial counsel cite a statement in the opinion in *Lewis v. Racine,* 179 Wis. 210, 220, 190 N. W. 476, that "market value [of stock] is to be determined from the value of that stock generally and not from the special value which accrued to plaintiffs by reason of their majority control." It is quite true that value of stock in taxation proceedings must be taken as "the value of that stock generally." For instance if A owned forty-nine per cent of the stock of a corporation and B owned two per cent and A desired B's stock to give him control of the corporation, what B might force A to pay him would not be receivable as evidence as the market value of the company's stock. In this case the plaintiff had paid under protest an income tax on gain on sale of corporate stock. In 1911 on consolidation of two corporations stock had been given a book value of $5 per share. The entire stock of the corporation was sold at $20 per share in 1916. The assets and earnings of the corporation were practically the same in 1911 and 1916. The plaintiffs had been taxed at $15 per share, the difference between the book value in 1911 and the sale price in 1916. Claim was made for a refund. There was no contention as to the market value in 1916 when all the stock of the corporation was sold. The contention was whether the testimony of two witnesses who fixed the market value of the common stock in 1911 at $40

per share on the ground that it was worth that sum "for purposes of control" on account of its "voting power." The common stock had exclusive voting power. One of the witnesses who so testified was one of the plaintiffs who considered that the only value of the stock was in its voting power as carrying control. The court says of this testimony that it was "competent," citing *Erd v. Chicago & N. W. R. Co.* 41 Wis. 65, and *Murray v. Norwood,* 77 Wis. 405, 46 N. W. 499, but "it was by no means conclusive." "It was the opinion of these men based on evidence which the board had before it and concerning a matter upon which the board was as competent to judge as were the witnesses. Conceding that this opinion evidence was entitled to the consideration of the board, it was not conclusive on the board if not in harmony with its own judgment." The broad general statement first made by the court first above quoted, if standing alone, would tend to support appellants' contention. But when what is said in connection with it is taken into consideration, the effect of the whole supports the view that the opinion evidence of Mr. Chapman was competent and should be considered by the court for what the court considered it worth, just as the opinion of the witnesses in the *Lewis Case, supra,* was for consideration by the board. General statements in opinions of courts have little weight apart from the factual situations in connection with which they are made. So considered the bald statement first above quoted would exclude the testimony of Mr. Chapman in the instant case, but, in view of the statement last above quoted, his evidence of value based in part upon voting power was competent and was entitled to be considered by the court, but was not conclusive upon it unless in harmony with its own judgment.

Appellants also make the broad contention that the court was bound to give the testimony of their expert witnesses more weight than that of Mr. Chapman, and cite in support

a statement in the opinion of *Hacker v. Kyle,* 211 Wis. 584, 599, 248 N. W. 134, that "the testimony of the investment bankers who had particularly considered the reorganization of the business is that $425 was a fair price . . . is controlling, although there is testimony of a witness of somewhat limited experience in commercial activities who testified that in some cases stocks were bought on as high a basis as ten or twelve times their earnings in a bull market in 1929." Quite so, perhaps, in that case, but it does not necessarily follow that a court is bound in every case to accept the testimony of more experienced witnesses in stock transactions in preference to those of less or even no actual experience. The point of that case was whether a few sales of small blocks of stock, made "under peculiar and unusual circumstances in a restricted market in a refinancing scheme," established the "fair market price or value of the stock held off the market." It was held that "as evidence of the value of holdings in the company prior to the reorganization was outweighed by testimony as to the actual value of stock in the old company given by persons familiar with the stock and the conditions supporting that value." *Hacker Case, supra,* p. 585. The holding of the court as to evaluation of the evidence in that case was as stated in paragraph 8 of the syllabus:

"Testimony of an officer of a corporation who was a minority stockholder and who sold his stock at the same price paid another minority stockholder who claimed to have been defrauded, coupled with the testimony of the investment bankers who had particularly considered the reorganization of the business, as to the value of the stock, is *held* to be controlling as against evidence of sales of a small block of the stock by underwriters, seventy-five per cent of the stock having been withheld from the market, and evidence of values based on the bull market of 1929."

We consider that in the instant case the trial judge was not obliged to forego the exercise of his own judgment as to

the credibility of the witnesses or the weight of their testimony as to value.

Appellants also cite art. 10 (c), Regulations 80 (1937 ed.), Estate Tax, relating to the evaluation of corporate stock for federal estate-tax purposes as follows: "The size of holdings of any security to be included in the gross estate is not a relevant factor and will not be considered in such determination." We cannot give to this regulation the effect of throwing out of the instant case the testimony of Mr. Chapman to the effect that in evaluating the instant block of stock he considered the fact that it constituted a majority of the corporate stock.

The respondents by motion to review ask us to direct modification of the judgment below by substituting $5,000 per share as the value of the stock and entering the amount of the taxes imposed on that basis. We see no reason for so doing. The only perceivable basis for fixing $5,000 as the market value of the stock would be that the appraisers fixed that value. The appellants claim that the appraisal is not evidence. The respondents claim that it is, and suggest that it is entitled to controlling weight because in an accounting proceeding a referee's determination of value based upon an appraisal of value made in county court in probate proceedings was properly held by the referee to be entitled to greater weight than the book value of the property involved which the court had held to be of the greater weight. *Ott v. Boring,* 139 Wis. 403, 121 N. W. 126, is cited in support. In that case the appraisers were examined before the referee to verify their findings. Here they were not. What weight their appraisal would be entitled to if they had been we need not determine. At most an appraisal value, even where statutory provision exists for its receipt, is only presumptive evidence of value. We know of no statute in this state giving an appraisal that effect, although an assessment entered on

a tax roll has, when the roll has the assessor's affidavit attached. Sec. 70.49, Stats.

We consider that the above sufficiently covers the matters raised by the appeal. The printed case consists of four hundred twenty-eight pages, the briefs of three hundred seventy-four. Detailed evaluation of items of evidence or further discussion of the contentions of counsel would unduly extend the opinion and would serve no useful purpose.

*By the Court.*—The judgment of the county court is affirmed.