HACKER, Plaintiff, vs. KYLE, Defendant. [Cross-appeals.]

*January 10—June 6, 1933.*

586

For the plaintiff there were briefs by *Miller, Mack & Fairchild,* and oral argument by *J. Gilbert Hardgrove* and *Frederic Sammond,* all of Milwaukee.

For the defendant there were briefs by *Lines, Spooner & Quarles,* attorneys, and *Louis Quarles* of Milwaukee, *Harry L. Butler* of Madison, and *Malcolm K. Whyte* of Milwaukee of counsel, and oral argument by *Mr. Butler, Mr. Quarles,* and *Mr. Whyte.*

The following opinion was filed April 11, 1933:

FAIRCHILD, J. As stated by respondent, the nature of the action is on contract under which the appellant, holding an option on the respondent's stock in a corporation, and which option he was about to exercise, agreed that the respondent might comply therewith and make a sale without waiver of a claim of fraud, a question as to which had arisen in her mind, and that in the event her claim of fraud was established he would pay her a sum of money to be determined in the manner set out in the contract, referred to in the statement of facts. On March 22, 1929, respondent signed an option on 304 shares of stock held by her in the Line Material Company, fixing the price at $425 per share. The negotiations leading up to the securing of this option are therefore the subject of investigation in conjunction with the agreement just referred to. In stating her cause of action respondent alleges inexperience in business matters, unfamiliarity with the true value of the stock, the condition of the business, and the opportunities for disposing of it. She further alleges that the appellant falsely and fraudulently represented to her that the stock was worth no more than $425 per share; that that was a very high price; that he thought he could sell all of the stock or the business of said company at such high price; that such sale would be possible only if all the stock

could be sold together; that his reasons for desiring to sell the business or the stock were that he had made enough to enable him to retire; that he desired to be relieved of the heavy responsibilities he was obliged to bear in relation to the management of the company, and advised that in his judgment it was to her best interests to execute and deliver the option. Respondent did sign the option, and under the circumstances to be related later sold her stock as the appellant desired her to do. That which led to or constituted the inducement to her selling is the element for which we must search in determining the existence or non-existence of any unfair or fraudulent representations; for, if she was fraudulently persuaded to part with her property, she would be entitled to rescind the sale.

Did the appellant make misrepresentations to respondent as to his desire to retire from active management of the business? The finding of the trial court on this point is: "The defendant informed the plaintiff that he intended and expected to retire from the business. He did not then intend or expect to retire. . . ." In his opinion concerning appellant's desire to retire the court said: "Either was untrue, or, if he actually expected to retire, he concealed from her the fact that all the negotiations he had previously been conducting absolutely required that he was obliged to continue as the managing head of the corporation." The evidence upon which the court reached that conclusion is found in the testimony of the respondent and her mother, the material portions of which in substance follow. Respondent testified:

"He told me that father had done a great deal for him in the early days of the Line Material Company with money, advice, with time in going down there; . . . that he was more grateful than he could tell mother or myself; . . . that he was extremely sorry to hear of his accident (which resulted in his death) ; that he had come over to talk with me and explain it to me; inasmuch as there was no man in the family

he would advise us to do this as the best thing to do; he advised his mother-in-law to do the same thing; he thought it was best if I did this, took the money and put it into government securities; . . . he told me he was going to refinance and reorganize the company, that he had worked hard, worked nights, and worked Sundays; that he would like to get out of the concern, he had plenty of money and that he thought he would like to get out. . . . It was a good price, $425 a share, for which he was going to have me sign the option; but he felt it was the thing for me to do. There really didn't seem very much alternative." "Q. Do you remember when you first saw counsel with reference to this case? A. Towards the end of April. . . . I had received information from somebody coming in mother's office down town commenting on the fact that Mr. Kyle had bought this stock at $425 and sold it at something over $600; that was the first I knew of anything of that nature. It was about two weeks, I think, after that when I went to your office."

She further testified that he was not a social friend, had never been at her house before, she had never had any dealings with him prior to March, 1929. In a deposition before trial she testified that Mr. Kyle said he was trying to get an option on all the stock except that of himself; that she did not know whether he was going to keep the stock, he did not tell her he was going to sell it; she did not recall anything as to whether he was going to sell or what he was going to do with it. Her recollection was that he simply said he wanted the option on the stock for that amount of money because he was going to refinance and reorganize the company. The evidence of the other member of the family who was present at the conversation between appellant and respondent at the time the giving of the option was discussed is in substance as outlined in respondent's testimony. This witness was respondent's mother and she testified that appellant explained about the stock, that he would do what he could for them, spoke of his affection for respondent's father, saying that he, the appellant, expected to get out of the company, that he

had sufficient means and did not wish to work as hard as he had been working, that he was advising his mother-in-law and his own family to do that which he was advising respondent to do. She recalled appellant's mentioning a business reorganization, but she was more impressed with his statement that he desired to leave the business, and paid no more attention to the reorganization. Shortly after this conversation the option was signed. In respondent's testimony upon the trial, when asked concerning the false representations upon which she relied, she said that among those false and fraudulent representations were, that he was a close friend of her father's and grateful for business assistance and advice in early years. This was qualified by the statement: "I don't claim that it is false and fraudulent. I don't think possibly it is false and fraudulent; but I don't think in view of what has gone on now, that it was altogether sincere. . . . The only thing I feel that Mr. Kyle did not tell me that was true was that he said the price was high, and my counsel now say that it was not so; that is about it. I have no recollection of any statement Mr. Kyle made which I have now found not to be true excepting that the price was a high price. I do not recall any specific statements. Merely the entire representation."

After the signing of the option and on or about April 29, 1929, the appellant found it necessary to secure from the respondent the proxy and waiver for a stockholders' meeting to be held on April 29th, referred to in the agreement of that day. He was then advised of the suspicions of the respondent as to the fairness of his transaction. He then agreed that she might have the benefit of the sale without waiving any claim of fraud; that in the event her claim of fraud was established he would pay her a sum of money to be determined upon under the terms set forth in the letter or agreement of April 29th. If determined that respondent

was induced to part with her stock at a lesser price than its value, then the agreement is to pay her "such larger amount, if any, as shall represent the fair value of the securities or other property which you are or would be entitled on a rescission of said option and/or said sale. . . . I bind myself to account for and pay to you the amounts which you would be entitled to on rescission in event that because of reorganization or other changes in the situation of the company, or its assets, or for any other reason it is impractical, or in the judgment of your counsel undesirable for you to have actual rescission made." At this time there was then under way the plan later entered into, devised with the assistance of the Milwaukee Company, involving the reorganization. Details of these plans were available and submitted to respondent. This offer at that time afforded her the opportunity to venture into the reorganization with him and also gave her the advantage of selling for the price agreed upon of $425, still holding the right to recover the converted assets if she should feel that this was to her advantage, if it was established that she had been the victim of a fraud; or, taking the difference, if any existed, between the $425 and the value of such stock to which she might become entitled.

The representation that appellant desired to retire from the business does not appear to have been a controlling factor in inducing the giving of the option. There is evidence of discussions of plans by appellant with brokers and bankers which contemplated a refinancing and reorganization of the Line Material Company. In the history of the inception of the idea of a reorganization on lines which would lead to the possibility of appellant's retirement from active management, it appears that Mr. Donaldson, a representative of a New York firm, first became interested through a broker who was endeavoring to sell some shares belonging to Mr. Hendee, a stockholder in the same company. Interviews between Donaldson and appellant occurred frequently thereafter, resulting in proposals of plans none of which contemplated

appellant to retire immediately from the management of the enterprise. Some plans required him to remain with the business for five years; other plans for three years. He was not to take cash for his interest. None of these plans met with his approval. Some obligated the reorganized company to the payment of certain amounts which, in his judgment, would have ruined the business and resulted in great disappointment to any possible purchasers of the stock. It is conceded that he did not discuss the details of these plans with respondent, and that no knowledge of them was imparted to her, except as they were suggested by his statement of the plan to refinance and reorganize the company, until the plan finally adopted was submitted to her April 29th. Upon his statement of his intention to reorganize the company she had seen no alternative but to sell and was then concerned with the price she was to get. The plans proposed by the New York bankers were rejected. Negotiations were then opened by the appellant with the Milwaukee Company in connection with which the ultimate plan was worked out. Under this plan appellant transferred the option on respondent's stock to the old corporation, whose business and assets were in turn absorbed by a new corporation organized under the laws of the state of Delaware.

In passing upon the question as to the influence upon her of appellant's intention to retire from business the decision must be influenced by the same considerations which were present in the case of *McDermott v. O'Neil Oil Co.* 200 Wis. 423, 228 N. W. 481, in which a statement made by a purchaser of stock of a company in which he was a dominating factor, that he intended to retire, was claimed to be fraudulent because it induced certain stockholders to sell their stock, and as a matter of fact he had not retired at the time of the litigation. In the opinion of the court it is said:

"It is true that up to the time of the trial he had not retired from the active management of the business of the Duro Company, but the announcement of his desire to retire

cannot be made the ground for setting aside this sale, because the stockholders knew when they voted to sell the property to Mr. O'Neil that he would be obliged to manage it until such time as he could make other disposition of it."

The evidence thus received does not make the expression of the appellant's desire to retire, in the light of his subsequent agreement to remain with the business for a limited time, ground for holding him guilty of misrepresentation and does not therefore constitute ground for actionable fraud. It is of that class of statements which may be described as the expression of a hope, seriously entertained, relating to a future course of action, and therefore subject to changes which circumstances beyond his control might force upon him. Under the law this does not amount to a fraud. *McDermott v. O'Neil Oil Co., supra; James Music Co. v. Bridge,* 134 Wis. 510, 114 N. W. 1108; *Milwaukee B. & C. Co. v. Schoknecht,* 108 Wis. 457, 84 N. W. 838.

Appellant's negotiations with the Milwaukee Company resulted in the plan of reorganization finally put into effect, under which respondent agreed to remain with the business for three years, to hold a large portion of the stock, and to refrain from offering any of it for sale for six months while the balance of the stock was being marketed. The practical effect of this arrangement was to bind effectively his fortune for the time being to that of the company's. Considerable significance attaches to the fact that no underwriter would negotiate a plan predicated on appellant's leaving the company, and it is true that when the negotiations were over he was the owner of stock in the new company in excess of his ownership of stock in the old company. But the carrying out of the plan in a way that would, after several years, permit him to get out of the business is not inconsistent with a present desire to retire, especially when, in order to get a value for his minority stockholders in the old company, and a portion of the value of his ownership in it, he was obliged to postpone his retirement for a period of at least three years.

The findings of the trial court with relation to his intention to retire are against the great weight and clear preponderance of the evidence, and are not sustained.

As already suggested, the evidence does not show that any material and influential details of future plans were fraudulently withheld from the respondent. Even if the limitations on a fiduciary dealing with an individual stockholder were present and the appellant could not purchase the stock from respondent without giving her the benefit of knowledge possessed by him which might have some influence upon the value of the stock, before we can find him failing in his fiduciary relation we must find him withholding something of substantial consequence. He told of his hope to refinance, reorganize, or sell the business of the company. The plan under which the business was sold had not been considered at the time he secured the option for her. But he frankly told her of his desire to reorganize the company, told her that he was buying all of the minority stock for a deal he wanted to consummate; and the plan finally adopted was laid before the respondent and her attorneys at the time she delivered the waiver and proxy essential to the consummation of the deal. It is difficult to discover any inference to be drawn from the evidence other than that in acquiring the option on the minority stock he was securing the entire ownership in himself for the purpose of effecting a reorganization which would enable him to accomplish his purpose.

Another claim of misrepresentation relates to the worth of the shares of stock in the old company. The only basis for the inference that this representation was false is that some stock in the reorganized company was sold at a price warranting that assumption. Standing alone that fact might reasonably sustain the inference. However, it is to be pointed out that the portion of the stock which came on to the market was that acquired by the underwriters, and sold in a market, artificial or stimulated, by virtue of agreement with Kyle that stock which constituted upwards of seventy-five

per cent. in the reorganized company was to be withheld from the market, in order to permit the other less than twenty-five per cent. to be sold at an advantage. Under the circumstances it was concluded by the trial court that the price obtained for the small block of stock under these conditions furnished an accurate measure of the value of the stock in the old company at the time when the representations were made. The price obtained was the result of the advantages contracted for by the underwriters as an incident to the reorganization. Had respondent retained her stock and become a party to the reorganization agreement, she would have been affected by the covenant restricting her right to sell during the period of six months; or had she declined to come in, no reorganization agreement would have been entered into, or at least none which did not adequately protect the underwriters in their ambition to secure profit out of the transaction.

The trial court, among other facts, found:

"He (appellant) was to be given in one form or another a large reward or profit in addition to the profit on his own shares of stock, which, it was explained in the testimony, was to be by way of compensation for his continuance in the management of the newly organized corporation. His continuance as such manager was an absolute essential to the consummation of every one of the plans presented. . . . In the course of his negotiations with Donaldson without consulting any other stockholders, he and Donaldson had tentatively determined the amount of the profit the defendant was to receive as a result of the sale of the company and the amount that he was to receive in addition by way of compensation for his remaining as general manager of the successor company which was to be organized."

In fixing upon the price of $425 a share to be paid the minority stockholders, appellant, in conjunction with Mr. Piereck, an accountant, and Mr. Hendee, the vice-president and sales manager of the company, who controlled about one-half of the minority stock, concluded that that amount would

be fair to the stockholders. This figure apparently was reached after some study and consideration of the condition then existing. Through appellant's management a large amount of money had been made for himself as well as earned for respondent and the other minority stockholders, all of whom were taking for their stock the same price respondent agreed to accept. As we have pointed out, in order to reach the conclusion that the stock in the old company was worth in excess of $425 a share, undue weight must be given to the marketing of about twenty-five per cent. of the stock in the new company with upwards of seventy-five per cent. so situated that it could not be sold. The different elements entering into the creating of a market for the smaller portion of the stock did not exist for the benefit of the unsold stock, and it is to that property, if anywhere in the reorganized company, we must go to find the basis on which to fix the worth of respondent's stock in the old company. Sales of the converted assets under peculiar and unusual circumstances in a restricted market in a refinancing scheme do not necessarily signify fair market price or value of stock held off the market, and as evidence of value of holdings in the old company are outweighed and overcome by evidence as to actual value of stock in the old company given by those familiar with the stock and the conditions supporting that value. In *Mandelbaum v. Goodyear T. & R. Co.* 6 Fed. (2d) 818, we find the statement that "stock quotations are in themselves not conclusive as to the actual value of the stock of a company. Such quotations are governed in great part by the demand—whether bidding is active or otherwise." If appellant told respondent truly what her property was worth and she sold and intended to sell on that basis, the question as to whether there was fair dealing is not affected by any loss or gain made in any deal after she had parted with her stock. When the new company was organized, the underwriter, the

Milwaukee Company, purchased 45,000 shares no-par stock issued by the new company; the total issue was 200,000. There was paid for the 45,000 shares $735,000. A one million dollar bond issue was perfected. Before the transfer of the assets of the old company to the new there was distributed to appellant through a contemporaneously organized company $865,000 in cash or its equivalent. The new Delaware corporation to which were transferred the assets subject to liabilities of the old company provided the funds necessary to pay to the respondent and the other minority stockholders the option price of $425 a share, amounting in all to $1,190,000. Had a sale of the entire stock of the old company been made at this price, there being 7,000 shares, the minority stockholders would have received their $1,190,000, the majority $1,785,000. Under the arrangement made the minority received its $1,190,000, the majority $865,000 plus 77½ interest in the new operating company, part of which was for appellant's agreement to remain with the company. It is necessary in order to establish the worth or the proper price of her stock in the old company to have some evidence of it other than the uncertain conclusions to be drawn from a speculative market organized so as to put on sale a small percentage of the stock of a successor to a company which had been unusually successful and which successor was to continue under the same management. The reorganization was a method of dividing some of the assets of the old company into various parts; it added nothing to the value; those parts added together would still be equal to the whole. The value of the stock in the old company would be the same. A marketing transaction of a limited number of shares under abnormal conditions cannot be relied upon in fixing value as against the testimony of qualified witnesses who were familiar with the old company's earnings, its dividend record, and its assets. Twenty per cent. of the minority stock in the

old company, or 1,428 shares, were controlled by Mr. Hendee, who has been described as the vice-president. He testified to his familiarity with the company's affairs, that he was a sales manager of the business, was familiar with its earnings, knew its prospects as well as any man in the business of the company, that he accepted the $425 a share for the stock he represented because in his judgment, based on what he knew of the condition of the business, its prospects and the pendency of the reorganization transaction, that was a fair price. The testimony of the investment bankers who had particularly considered the reorganization of the business is that $425 was a fair price at the time of securing the option. That evidence is controlling, although there is testimony of a witness of somewhat limited experience in commercial activities who testified that in some cases stocks were bought on as high a basis as ten or twelve times their earnings in a bull market in 1929. The appellant was not dealing in a stock sales venture, and the respondent had no occasion to expect that her values would fluctuate with the market of a small per cent. of a total stock of a company, as distinguished from a value of stock in connection with a going concern. There was no showing of market price in the sense that any share could command that price if all the stock were included. Respondent was receiving a lump sum for her holdings in the company, was being relieved from any liability to or possibility of future loss by reason of business depression or any of the exigencies which work themselves into business conditions. There is an absence of evidence sufficient to sustain the charge of fraud and there is present substantial and controlling evidence to the effect that respondent received the full worth of her stock in the old Line Material Company.

We find it impossible to conclude that the price obtained for small blocks of this stock in an artificially maintained

market is a proper measure of the value of the old stock at the time of the representation. There is no evidence in the record other than this as to what the assets of the old company amounted to or what the old stock would sell for on the market at the time of the transaction in question, except that offered by the appellant, and this is to the effect that $425 was a fair price for the stock.

It is unnecessary to discuss the segregation of the amount of stock assigned to appellant as an inducement to take the management of the new company. He was induced to remain with the company and some stock was assigned to him for that purpose. Such stock, given to assure the continuation of a capable management that had built an industry from a $5,000 to a $2,975,000 concern, to induce the appellant to postpone his retirement therefrom for a period of three years, and to keep him from selling any of the 155,000 shares allotted to him for his interest in the business, the respondent having no control over the services of the appellant, was compensation flowing to him for those considerations and would be his and his alone.

The evidence negatives fraud on the part of appellant, actual or constructive, and can only sustain findings that respondent was not misled and that she was paid a full price for her stock.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss plaintiff's complaint.

FRITZ, J., dissents.

A motion for a rehearing was denied, with $25 costs, on June 6, 1933.