STEVEN, Respondent, vs. HALE-HAAS CORPORATION and others, Appellants.*

*January 10, April 29—June 22, 1946.*

* Motion for rehearing denied, with $25 costs, on September 28, 1946.

208

For the appellants there were briefs by *Doherty, Rumble, Butler, Sullivan & Mitchell* of St. Paul, Minnesota, and *A. C. Gregg* of Eau Claire, and oral argument by *Mr. Pierce Butler* and *Mr. Gregg.*

For the respondent there were briefs by *Oppenheimer, Hodgson, Brown, Donnelly & Baer* of St. Paul, Minnesota, and *Ramsdell, King & Linderman* of Eau Claire, and oral argument by *Bailey Ramsdell* and *S. D. Donnelly.*

WICKHEM, J.   The principal contention of appellants is that the findings of fact are insufficient to support the conclusions of law and judgment.

This was an action by a minority stockholder on behalf of Hale-Haas and Eau Claire, seeking equitable redress for alleged wrongs to the corporations by defendants.

Hale-Haas is engaged either in publishing schoolbooks and manufacturing school supplies, or in holding stock in companies so engaged.   The record does not disclose which and the matter is not of importance.   Eau Claire, Michigan School Service Company, Minneapolis School & Supply Company, and Sioux Falls Book & Stationery Company were wholly owned subsidiaries of Hale-Haas.   During the depression the company's financial position became such as to require sale of the Minneapolis and Sioux Falls Companies and the issuance of preferred stock for further financing.   Hale-Haas has

outstanding 1,211 shares of five per cent preferred stock of the par value of $100, subject to call at $105 per share. Of this, plaintiff owns 145 shares and his son three shares. Defendant, Hale, who in recent years has been president and director of the company, owns 1,062 shares of preferred stock, some of it acquired by transactions that are under question in this action.

Hale-Haas has an authorized capital of 35,000 shares of voting nonpar common stock, 19,770 shares of it outstanding. Of the outstanding shares plaintiff owns 5,250 and his son seven shares. Defendant, Hale, owns 7,934 shares and is the purchaser of 3,392 shares more under an instalment contract giving him the right to vote it. Three thousand one hundred eighty-seven shares are owned by others than plaintiff, and it is not considered necessary to list the owners of the stock or to comment on their situation, further than to state that they are made defendants and have not concurred with plaintiff in his opposition to the transactions questioned in this action. The officers and directors of Hale-Haas and Eau Claire are identical.

After setting forth the foregoing matters in respect of Hale-Haas and its subsidiaries, the complaint alleges that defendant, Beach, had for several years been attorney for Hale-Haas, Eau Claire, and for Hale, and that for several years Hale and Beach had planned so to manipulate the stock of Hale-Haas as to put the majority control in the hands of Beach through the Pedee Investment Company, also a defendant; that in 1943 Hale and Beach entered into an agreement by which Beach agreed to and did furnish Hale with funds from the Pedee Company to purchase all outstanding preferred stock of Hale-Haas in consideration of which Hale agreed to and did use his stock control and official position as member of the board of directors and president of Hale-Haas to have the stock called, thus furnishing Hale funds with which to repay the loan and enabling him to make a personal profit equal to the

difference between the call price and the price at which he was able to purchase it; that it was part of the agreement that Pedee Company would provide funds to Hale-Haas with which to call the preferred stock by purchasing common stock which Hale agreed to have issued and delivered to Beach at $10 per share; that the agreement included an understanding that Beach would have the Pedee Investment Company loan $120,000 to Eau Claire for the purpose of calling all of the outstanding preferred stock of that company; that this loan was for a period of six months and at the end of that time, after some pressure to be exerted by Beach, Hale was to arrange to have additional common stock of Hale-Haas sold to Beach at $10 a share in order to raise the sum of $120,000 to liquidate the note. It is alleged that in pursuance of this arrangement Hale bought up 1,062 shares of the preferred stock of Hale-Haas for about $75 a share; that Beach furnished the money through the Pedee Company which held the stock as security for the loan; that on or about July 15, 1943, Hale caused a meeting of the directors of Eau Claire to be held, and without advising them of his agreement with Beach, had resolutions adopted calling the preferred stock of Eau Claire; that all of the preferred stock so called was paid for with the proceeds of the note to Pedee Investment Company; that in further compliance with the agreement, Hale caused a meeting of the board of directors of Hale-Haas to be held and there proposed a complete plan for carrying out his agreement with Beach, although he did not inform the directors as to his agreement but attempted to convince them that this plan was for the benefit and best interests of the corporation. As a result of early action by plaintiff to enjoin carrying out of the plan a meeting of the board of directors called by Hale adopted a resolution abandoning and rescinding the plan of reorganization. It is alleged that Hale intended at the time of the resolution of rescission and still intends to carry out the agreement. It is alleged that after such resolution of rescission and an

order dismissing plaintiff's action without prejudice, defendants, Beach and Hale, took further steps in furtherance of their agreement. It is alleged that the purpose of the agreement was to make it possible for Pedee to acquire at least 20,000 shares of the common stock of Hale-Haas at a price of $10, while the stock has a value of at least $17 a share, thereby giving Pedee control of the company at a price below the worth of the stock, and permitting Hale to realize a secret profit of about $35,000 from his stock-purchasing activities. It was alleged that the agreement is illegal and improper because it constituted an agreement by Hale to use his position of confidence and trust and the exercise of his official power to the gain of persons outside the corporation, as well as himself, and at the expense of the stockholders who had placed him in official position.

Beach is charged with using his position as attorney and counselor for the same purpose. The allegation is made that the action of the board of directors of Eau Claire is void because an integral part of the stock manipulations theretofore alleged. The complaint contains the usual allegations that—

". . . the reason this action is not brought by the Hale-Haas Corporation is that the defendants Earl M. Hale, Egon Weiss, Charles A. Irwin and F. H. Thompson, who constitute the board of directors of said corporation, have refused and neglected to bring or prosecute this action, and after being informed of the illegal acts of the defendants P. M. Beach and Earl M. Hale have refused and neglected to take any action whatsoever, and the reason why this action is not brought by the defendant Eau Claire Book & Stationery Company is that the directors of said corporation have refused and neglected to take any action to protect the interests of that corporation."

It is alleged that plaintiff has no adequate remedy at law; that execution of the agreement between Hale and Beach will depreciate plaintiff's stock and cause irreparable damage. The prayer of the complaint is that defendants be restrained from

taking any steps to carry out the plan and agreement, and that Hale-Haas be enjoined from disposing of any of its common stock except at a fair and equitable price; that Eau Claire be enjoined from paying any sum of money to Pedee Investment Company in connection with its note of $120,000; that Hale-Haas be enjoined from calling any of its outstanding preferred stock except by proceedings not participated in by defendant Hale, and that Hale be required to turn over said preferred stock owned by him to Hale-Haas at the exact price he paid for it; that Beach be enjoined from purchasing any of the common stock of Hale-Haas at $10 a share or at any price less than its fair and equitable value; that Beach, Hale and any other individual defendants who may have been found to have been unfaithful to their trust be enjoined from collecting any sums of money from Hale-Haas or Eau Claire for services rendered said corporations since the execution of the agreement between Hale and Beach; that plaintiff recover the expense of his suit and that if it be discovered that plaintiff or Hale-Haas or Eau Claire have suffered damages by reason of the conduct of individual defendants, each such person have his damages and such further relief as is equitable.

We shall not concern ourselves with the answer, further than to say that it puts into issue all matters of importance upon this appeal. The court filed findings of fact and conclusions of law. These are not attacked as unsupported by evidence except a finding that common stock of Hale-Haas was worth more than $10 per share.

After setting forth facts concerning the organization of Hale-Haas, its stock setup, and its relationship to various subsidiaries, the findings, so far as material here, are to the following effect. For better understanding they are put into a condensed and narrative form without respect to the numbers of the findings.

Carl Haas, stockholder and vice-president of Hale-Haas, died in August, 1940, at which time plaintiff owned 5,257

shares of the common stock of Hale-Haas, Hale 5,370 shares, and Haas 3,773 shares. Hale purchased all of the shares of Haas upon a long-term contract. Upon learning of this, plaintiff sought without success to enter into a "buy or sell" contract with Hale. On February 7, 1941, Hale notified plaintiff by memorandum of his recommendations for officers of the several corporations, indicating his intention to replace plaintiff as president of Hale-Haas and Eau Claire, leaving plaintiff to be chairman of the board of directors of Hale-Haas. The memorandum also stated that he would recommend that the directors do not retire any of the preferred stock of Hale-Haas or of Eau Claire. At the meeting of February 11, 1941, Hale's plan was carried through, and in the stockholders' meeting the articles amended by increasing the number of directors from three to five and decreasing the authorized capital from 5,000 to 2,000 shares $100 par value of preferred stock and from 80,000 to 35,000 shares of nonpar-value common stock. On June 30, 1941, without notice, defendants Hale, Weiss, and Irwin held an informal meeting of the board of directors of Hale-Haas and adopted an employees' bonus plan which involved, among other things, the creation of a trust fund by contributions from the corporations and the employees. The trustee was to acquire from Hale his contract for the purchase of the 3,773 shares of common stock of Hale-Haas stock, reserving to Hale voting rights until the full payment of the purchase price, and providing for an insurance policy on the life of Hale sufficient to pay the amount of the contract in case of his death.

Plaintiff learned of this plan shortly after July 7, 1941, and brought action to restrain Hale-Haas and defendants from proceeding with the plan. While the action was pending, plaintiff entered into a memorandum settling the differences between him and the directors. This memorandum provided for retention of plaintiff on the board of directors for a speci-

fied period, continuation of his office quarters and abandon-
ment of the stock-bonus plan. Plaintiff's action was dismissed
as a result.

On December 1, 1941, Hale-Haas borrowed $50,000 from
Pedee Company and $50,000 from Drummond Investment
Company, giving each an unsecured promissory note payable
in eighteen months. These loans were made upon the condi-
tion that the lenders be kept advised concerning the business
of Hale-Haas and that no change in its financing be made with-
out the consent of the lenders during the existence of the loan.
The notes were paid before they were due. On November 12,
1942, defendant Hale borrowed personally through defendant
Beach $25,000 from the Drummond Investment Company and
$25,000 from the Pedee Investment Company and gave prom-
issory notes secured by his stock in Hale-Haas. He used the
proceeds of the loans in discharge of outstanding personal ob-
ligations previously incurred as comaker with plaintiff of a
note in connection with the purchase of Eau Claire stock.
These notes were renewed for one year on April 20, 1943, and
by assignment Pedee Investment Company became the owner
of both notes. During 1943 defendant Pedee Investment
Company made loans to Hale to enable the latter to purchase
common and preferred stock of Hale-Haas corporation. These
loans are separately listed in the findings and were made as
Hale succeeded in arriving at a purchase agreement with in-
dividual stockholders. In each instance the stock purchased
was delivered to Pedee Investment Company as security for
the advances made, and on October 15, 1943, the total amount
advanced for this purpose was $100,208.75. This loan was
consolidated with a prior loan of $50,000 and Hale gave Pedee
Investment Company a note for $150,208.75, and one for
$1,713.10 covering interest due on loans and advances. The
large note was secured by all of the stock owned by Hale in
Hale-Haas, being 1,062 shares of preferred and 7,934 shares

of common. Hale had no means of meeting such obligation other than by liquidating the stock.

Commencing in 1941 plaintiff had talks with each of defendants concerning the capital structure of Hale-Haas and its management, and repeatedly sought to sell the stock to the corporation or to buy that of Hale, and in 1943 plaintiff placed a value of $15 a share on his common stock and $100 a share on the preferred stock. As a result of these conferences defendant Beach handed plaintiff a memorandum about July 15, 1943, purporting to outline "steps necessary to simplify the capital-stock structure and other matters pertaining to the Hale-Haas Corporation and the companies in which it owns stock." Beach proposed in the memorandum that with funds to be obtained all stock of plaintiff in Hale-Haas be purchased at $10 a share for the common and $75 a share for the preferred, or in the alternative, that plaintiff be paid par for his preferred and that his common stock be not purchased. This proposal was rejected. In the memorandum defendant Beach stated that so long as preferred stock in Hale-Haas of $121,000 and preferred stock in Eau Claire of $117,300 remained outstanding it would be doubtful whether the common stock would pay dividends for many years, and that aside from this there was need for more working capital with funds to be obtained. The proposal was to retire the preferred stock of Eau Claire by a loan of $120,000 for six months at three per cent and then to have Hale-Haas assume the debt and discharge it by issuing common stock at $10 a share "to the people who made the loan." The preferred stock of Hale-Haas was to be retired by exchanging it for common stock in the same company at $10 a share. Common stock up to 25,000 shares at $10 a share for working capital was to be issued as needed in the future.

Various reasons were set forth in the memorandum why $10 a share for the common stock constituted a fair price. On July 15, 1943, the board of directors of Eau Claire voted in

accordance with the memorandum to borrow $120,000 for the purpose of redeeming the preferred stock of the company. On the same day Hale wrote Mr. Boulter, secretary of Pedee Investment Company, inclosing certificates for preferred and common stock he had just purchased from an estate, and made arrangements to meet Beach and the secretary at the latter's office on July 22d.  On July 22, 1943, at the meeting Hale received advances from Pedee Investment Company of $975 and $28,750 for the purchase of preferred stock from two holders thereof and also a loan of $120,000 on the promissory note of Eau Claire which he signed as president.  Thereafter, defendant Beach wrote plaintiff declining to advance funds for the purpose of buying plaintiff's stock at any price, and stating that the Pedee Investment Company felt that $75 for the preferred and $10 for the common was a fair price, but so far below anything plaintiff would consider that Pedee was not interested in buying the stock at all.

Boulter was a member of Edward Gore & Company, accountants of Chicago.  This company was engaged as auditors in place of local auditors who had served Hale-Haas and Eau Claire for many years.  With the loan of $120,000 Hale and his associates retired all of the preferred stock of Eau Claire. On October 7, 1943, plaintiff received from defendant Irwin, secretary of Hale-Haas, notice of a regular meeting of the board of directors to be held on October 18, 1943, and that the directors would discuss and vote upon the plan and other matters contained in the forms of resolution which were attached to the notice, together with financial statements and argumentative material similar to the memorandum previously referred to.  The proposal was that Hale-Haas stock be issued for $10 a share to retire its preferred stock and to pay the note of Eau Claire, and the resolution provided for a meeting of the stockholders to increase the capital stock from 35,000 to 80,000 shares.  At a meeting with Beach on October 16, 1943, plaintiff objected to the plan on the ground that the price of

$10 a share for the common stock was too low, and that defendant Hale would make a lot of money from the retirement of the preferred stock. He proposed the purchase of his stock as a way out of the difficulty. The meeting of October 18, 1943, resulted in adoption of the plan, plaintiff voting in opposition. Plaintiff then brought action to restrain defendants from proceeding with the plan and obtained a temporary restraining order.

On November 15, 1943, the plan was abandoned and the action dismissed. On December 6, 1943, a special meeting of the board of directors of Hale-Haas was called for December 9, 1943, and a copy of minutes prepared in advance indicated that the plan recently abandoned was to be adopted subject to "pre-emptive rights of stockholders." This plan was carried over plaintiff's vote. As a result of the adoption of the plan, plaintiff brought the present action.

On December 30, 1943, at a special directors' meeting all compensation of plaintiff was terminated as of December 31st, and plaintiff was replaced as director. On February 7, 1944, plaintiff submitted an offer to Hale-Haas of $15 a share on the proposed sale of 12,460 shares of Hale-Haas common stock, stating that he was making this proposal on behalf of several substantial investors from Eau Claire, and that neither he nor anyone of them alone would secure control of the corporation through the acquisition. He specified thirty days to complete the purchase and that he would buy "no less than 12,460 shares." On February 23d the corporation made a counteroffer to sell to plaintiff and his associates at $15 a share as many shares as should not be subscribed to by present stockholders, or to recommend an increase in capital stock so that 12,460 shares might become available from that source. Plaintiff replied and maintained his original offer, impliedly rejecting the counterproposal.

Early in 1941 Pedee Investment Company had embarked upon an investment policy of buying stocks of corporations

which it could supervise. It became interested in Hale-Haas and had in mind that it should invest $350,000 in common stock of Hale-Haas and the loans to Hale, Eau Claire, and the present offer to buy any part of 12,460 shares of unissued common stock at $10 a share are steps in the direction of such stock ownership. The common stock of Hale-Haas had a book value for the years beginning 1939 and ending in 1943 as follows: 1939, $11.06; 1940, $12.34; 1941, $14.19; 1942, $16.13; 1943, $18.24.

Sales of the stock have been few. In 1940, 3,773 shares were sold to Hale at $12.50 a share upon a long-term contract. In 1943 Hale purchased 600 shares at $7.25, 1,583 at $10, and "the value of said stock is in excess of $10 a share." The proposals sought to be restrained "are not in the interest of Eau Claire Book & Stationery Company and Hale-Haas Corporation or the stockholders thereof, and serve instead the interests of the defendant Earl M. Hale and his creditor, Pedee Investment Company, and constitute a lack of good faith and an abuse of discretion by the directors and managing officers of said corporations."

Defendant Beach was a member of a law firm which, with its predecessor, served as legal counsel for Hale-Haas and Eau Claire for many years, but that the acts of Beach and the schemes involved here were on behalf of "his people," the Pedee Investment Company, and were so known to plaintiff and other officers and directors of Hale-Haas and Eau Claire.

It will at once be noted that the findings are essentially a plain recitation in chronological order and in great detail of the transactions involved in this action. These amount virtually to a recitation of the evidence from which inferences governing the result of this case may or may not be drawn, without any attempt other than by a general characterization of the scheme specifically to draw these inferences. There is, for example, no specific finding that the plan involved an agreement by Hale to misuse his corporate office in consideration

for financial support so that he might purchase preferred stock in anticipation of its call. The fact that Hale borrowed money to purchase preferred stock for resale at a profit upon its call is recited as a separate event connected with the other events only in point of time. There is no finding that this transaction on the part of Hale forestalled Hale-Haas from making a saving upon its call of the preferred stock. There is no specific finding that the transaction as a whole was improvident in respect of Hale-Haas or any of its subsidiaries. The only finding as to value is that the common stock was worth more than $10 per share, and there is no specific finding that the stock was worth so much more than $10 a share that its issue at that price was an abuse of the directors' discretion. This appraisal of the findings is made at this point to direct attention to their general character. Its significance will appear in its proper place in the opinion.

At the outset it may be convenient to set forth certain principles and rules of law that we consider to be sound and well-established, and then to consider their application to the case in the present state of its record:

(1) If we must consider it a verity that there was a general plan, scheme, conspiracy, or agreement between Hale and Beach involving on the part of Hale an agreement to use his official position and vote to effect the consummation of corporate action by Hale-Haas for the benefit of Pedee Investment Company in consideration for financial and other advantages to him, the judgment must be affirmed without inquiry as to actual damage caused to Hale-Haas. A corrupt bargain which deprives Hale-Haas and its stockholders of the honest judgment of its officers and directors is itself an important injury to the corporation, and those who participate in such a bargain are not in position to demand an independent determination as to possible benefits to the corporation resulting from the transaction itself. Upon such a state of facts the corporate action may be enjoined so far as it is executory, and

set aside to the extent that it has been consummated. *Koelbel v. Tecktonius,* 228 Wis. 317, 280 N. W. 305; *Boyd v. Mutual Fire Asso.* 116 Wis. 155, 90 N. W. 1086, 94 N. W. 171; *Timme v. Kopmeier,* 162 Wis. 571, 156 N. W. 961; *Sauerhering v. Rueping,* 137 Wis. 407, 119 N. W. 184.

(2) Assuming that there is no finding sufficiently establishing a specific bargain to barter away the vote of the officers and directors for an improper consideration, the transaction itself may be so obviously injurious to the corporation as to compel a finding that no consideration of its interests was in the minds of its officers and directors and that they must have been motivated by self-interest or by concern with the interests of outside parties. In this situation the transaction may be enjoined. The only difference between this situation and that outlined in (1) is that here the damage to the corporation and the obvious improvidence of the scheme viewed in the light of the needs of the corporation constitutes proof of improper motives and of the failure to exercise the judgment and good faith required of officers and directors. *Theis v. Durr,* 125 Wis. 651, 104 N. W. 985; *Martin Orchard Co. v. Fruit Growers C. Co.* 203 Wis. 97, 233 N. W. 603; *Thauer v. Gaebler,* 202 Wis. 296, 232 N. W. 561.

(3) Assuming that the evidence and findings do not disclose situations outlined in the preceding two paragraphs (that is a corrupt bargain or corporate action so patently harmful to the corporation as to indicate an abuse of discretion), this court will not substitute its judgment for that of the board of directors and assume to appraise the wisdom of any corporate action. The business of a corporation is committed to its officers and directors, and if their actions are consistent with the exercise of honest discretion, the management of the corporation cannot be assumed by the court. *Thauer v. Gaebler, supra; Theis v. Durr, supra.*

(4) The mere fact that a director or officer of a corporation, knowing of the likelihood of a reorganization that will increase

the value of corporate stock, buys stock from stockholders at a discount without disclosing his inside information, constitutes an injury to the vendors of the stock but not to the corporation itself, unless it appears that by his purchase the corporation was forestalled of an opportunity to make the purchase to its advantage. *Schroeder v. Carroll,* 192 Wis. 460, 212 N. W. 299; *Hacker v. Kyle,* 211 Wis. 584, 248 N. W. 134; *Nichol v. Sensenbrenner,* 220 Wis. 165, 263 N. W. 650.

The rule is, of course, inapplicable where the opportunity of such an officer or director has been created by an agreement with outsiders which constitutes an abdication of his duties as director. We simply hold that, independently considered, whatever cause of action exists, is not in the corporation. There is also no intention to hold that in the background of dealings between a director and outsiders such an opportunity may not have its place as an item of proof supporting the contention that a particular corporate action was not an exercise in good faith of the directors' discretion.

In the light of the foregoing it now becomes necessary to analyze the findings in order to see what application the foregoing principles have to the case. It may contribute to the clarity of this opinion if the findings are discussed in relation to each of the foregoing statements of law.

(1) As has heretofore been stated, the trial court made no specific finding that there was a bargain whereby Hale sold his corporate vote in consideration of financial advantages to himself. What was done in respect of the corporate loan to Hale is simply recited in its chronological order and we are left to draw whatever inferences are permissible from the fact that in point of time this transaction occurred while a corporate reorganization was being planned. We are unable to say that the findings in this form are open to the inference that Hale sold his corporate vote in consideration of financial advantages to himself. There is no doubt that Hale contemplated a profit out of the purchase and later call of preferred

stock of Hale-Haas. There is no doubt that Pedee Investment Company was agreeable that he should make this profit and were willing to lend him money upon the security of the stock. There is nothing, however, in the findings to evidence that this was more than an unconnected incident, and the findings are far from enough to indicate that financial support by Pedee Investment Company was the consideration for the sale of Hale's corporate vote. It should also be observed that if there is anything to plaintiff's contention that the value of the common stock would be diluted by execution of the plan of reorganization Hale would lose more on the transaction as a whole by reason of the dilution of his own common stock than he would gain in profit upon the purchase and sale of preferred stock. While the only question litigated in this case is whether the findings support the judgment, we have considered it necessary, in view of the doctrine of this court that the absence of findings in equity will not defeat a judgment if the evidence supports it, to consider whether the judgment independently of the findings is supported by the evidence, and particularly, whether the more general findings of the court characterizing the transaction heretofore discussed are supported by the evidence. On this point, see the following cases: *Wilkinson v. Wilkinson,* 59 Wis. 557, 18 N. W. 527; *Brown v. Griswold,* 109 Wis. 275, 85 N. W. 363; *Farmer v. St. Croix Power Co.* 117 Wis. 76, 93 N. W. 830; *Closuit v. John Arpin Lumber Co.* 130 Wis. 258, 110 N. W. 222; *Young v. Miner,* 141 Wis. 501, 124 N. W. 660; *Jansen v. Huerth,* 143 Wis. 363, 127 N. W. 945; *Damman v. Damman,* 145 Wis. 122, 128 N. W. 1062.

In most of the cases cited, the trial court failed to make any findings at all or merely set forth a few general conclusions concerning the effect of the evidence which either did not rise to the dignity of findings or did not specifically deal with litigated issues of fact. The general difficulty of applying the rule set out in the foregoing cases is that here, with the exception of

the general characterization of the scheme, the findings are really a recitation of all the evidence that has any bearing upon the matter, and if they do not support the general conclusions of the court or the judgment itself the rule has no room for operation.

So far as the scheme amounts to an attempt to put the control of Hale-Haas in the Pedee Investment Company, little comment need be made. Hale had a majority of the stock of Hale-Haas and was in a position to put Pedee Investment Company in control of Hale-Haas by a very much simpler process than the plan involved. It was suggested in the argument that the evidence would warrant a finding that a long-term employment contract by Hale-Haas to Hale was a consideration for his participation in the scheme. There is no finding to this effect and a careful examination of the evidence indicates that no such finding could be sustained.

We conclude that neither the findings nor the evidence will support the judgment if the latter must depend upon the existence of a scheme involving the sale of Hale's official vote in Hale-Haas.

The next question is whether the findings disclose a plan so clearly against the interests of Hale-Haas as to indicate that the scheme was not devised in its interests and must have had for its purpose the promotion of interests other than those of the corporation. Excluding for the moment all questions as to the value of the common stock of Hale-Haas, we are of the view that the providence of the scheme falls within the realm of reasonable debate. The advantage of keeping preferred stock, or of retiring it by the issuance of common stock, involves complex considerations, and on this point there is room for sharp difference of opinion between those who are engaged and skilful in the conduct of corporate enterprises. The fact that preferred stock has a preference, both as to distribution of assets and as to payment of dividends, may, without abuse of discretion, be considered to make it less desirable than an

issue of common stock which will not be subject to those priorities. On the other hand, it may legitimately be considered that there are advantages in keeping preferred stock, especially if it is nonvoting and subject to retirement at any time or at a definite time at a specified price. Every person familiar with corporate finance knows that there are various and complex methods of satisfying the financial needs of a corporation and sharp differences of opinion as to the advantages and disadvantages of these. This is demonstrated by the variety and complexity of present corporate structures. We see nothing in the plan itself, either as applied to Hale-Haas or to Eau Claire, from which ulterior motives or abuse of discretion can be inferred.

It is intimated in respondent's brief that Eau Claire was not in a position to retire its note within the six months' period which was within its term, and that the plan was to have a short-term note and then by pressure to meet payment of this note force Eau Claire to accept the plan of having Hale-Haas common stock issued to Pedee Investment Company to secure funds for its payment. The force of this suggestion is dissipated when it is considered that the issuance of Hale-Haas stock was a part of the original plan and that Eau Claire was a wholly owned subsidiary with the same officers and directors as Hale-Haas. It is claimed that the reorganization brought no new capital to the company, but the findings plainly indicate that it was contemplated, (1) that the amount of authorized common stock ultimately be increased, and (2) that Pedee Investment Company would ultimately put money into the corporation over and above the sum necessary to retire the preferred stock of Hale-Haas and Eau Claire.

So clearly related to the general providence of the scheme as to warrant discussion in that connection is the matter of the value of the common stock and the significance of the fact that the plan sought to be enjoined does secure to existing stockholders their pre-emptive rights to purchase the new issue of

stock. It will be remembered that the trial court found that the value of the stock was greater than $10 a share. There was, however, no finding as to how much the stock was worth or how much the stock could be sold for without abuse of discretion on the part of directors. What the court did was to recite the book value of the stock during the various years involved here and the sales of stock in 1943 and other years, together with the amount that the stock sold for. As a conclusion, the court simply found that the stock was worth more than $10 a share.

We discuss this point here because if the stock was clearly worth substantially more than $10 a share that might point to the fact that the whole scheme was in the interests of Pedee Investment Company; that it was oppressive to stockholders, improvident as to Hale-Haas, and that it constitute an abuse of discretion by the directors. In order that the significance of this may sufficiently appear, it is necessary to give some consideration to the fact that the scheme as ultimately perfected did give to existing stockholders their pre-emptive rights. Defendants contend that this removed, as a matter of law, all objections to the fact that the stock was offered at less than its value, if indeed, that was the fact. Plaintiff claims that the giving of a pre-emptive right under the circumstances of this case will not cure fraud, abuse of discretion, or oppressive action in a plan which involves the sale of stock at less than its value. The right of a stockholder to have offered to him for subscription his proper proportion of a new issue of stock is generally regarded as inherent in his status as a stockholder. Where recognized, this right must be satisfied before a new issue of stock can validly be sold to outsiders. Assuming that the new issue of stock is to be offered to outsiders at its true worth, the purpose of the pre-emptive right is to protect the stockholder from dilution of his control in the corporation. *Hammer v. Cash,* 172 Wis. 185, 178 N. W. 465; *Estate of Frederick F. Merrill,* 196 Wis. 351, 220 N. W. 215; 38 Yale

Law Journal, 563; 43 Harvard Law Review, 586; 42 Harvard Law Review, 186. Where the new issue is to be offered at less than its true worth the pre-emptive right also operates to protect existing stockholders from dilution of the value of their stock by diminishing their proportionate interest in the assets of the company. In such situations, the issuance of stock at materially less than its value may be of such injury to the stockholders as a whole that the pre-emptive right will not be adequate protection to them, and in a proper case, the conclusion may be justified that the corporate action authorizing issue at such a price constitutes abuse of discretion by the directors and fraudulent or oppressive action against the stockholders or action taken in the interests of outsiders. *Luther v. C. J. Luther Co.* 118 Wis. 112, 94 N. W. 69. Since this is an action in which the parties agree that injury must be shown to the corporation, and since the pre-emptive right was given there must be circumstances warranting application of the rule above referred to. These circumstances will differ according to the character and situation of the corporation and the disparity between the price at which the new stock is to be sold and its true value. If, for example, stock is issued at slightly less than its true value, that may not be enough to indicate abuse of discretion on the part of the directors and the shareholders will be relegated to such protection as the pre-emptive right gives. Even where there is a great disparity between the price at which the new stock is to be sold and its true value, the circumstances may be such as to warrant different conclusions in different situations. For example, in a corporation in which the stock is listed, widely held, and frequently dealt in, the sales rights issued in recognition of the pre-emptive rights of shareholder may be readily sold for their full value or the new stock acquired by such a small payment that the stockholders are not damaged, and the disparity may not indicate an abuse of discretion. On the other hand, in a closely held corporation which operates locally the same factor

that makes it difficult to appraise the value of the stock may make it equally difficult in the event that new stock is issued for substantially less than its true value to get any substantial protection from the exercise of the pre-emptive right. This, for the reason that there will be no greater sale for subscription rights than there is for the stock itself, and that those stockholders who had sufficient control of the corporation to achieve reorganization are apt not to be in the market for further shares. The circumstances may therefore point to an oppressive attempt on the part of the controlling majority to compel minority stockholders to keep putting more money into the corporation in order to prevent dilution of their equity.

We consider, therefore, that plaintiff is right in his assertion that in a closely held corporation the fact that the issue is to be sold at materially less than its value may evidence an oppressive scheme directed against minority stockholders and render wholly invalid as an abuse of discretion, irrespective of provisions for pre-emptive rights, the corporate action authorizing the issue.

The question in any given case is whether under all the circumstances, including the amount of disparity between the issuing price of the stock and its true value, the nature of the corporation, the known ability of stockholders to sell voting rights, or to invest further sums in the company, the scheme must be condemned as an oppressive device or an abuse of official discretion. If in this case $10 per share was clearly and plainly below the true value of the common stock, to a substantial extent that would strongly evidence an abuse of discretion, and giving to existing stockholders a right to subscribe would not cure the difficulty. The offer to plaintiff of his pre-emptive right satisfied a minimum requirement of the law but it did no more than this.

In the light of this, we examine the findings and evidence as to value. The finding is, of course, inadequate in scope, since it is merely to the effect that the stock was worth more than

$10 per share. The question is not whether it was worth more than $10 a share, but whether its issuance at $10 a share was so clearly and substantially below the value of the stock as to indicate bad faith and abuse of discretion. Again, reverting to the proposition that if there is evidence to sustain the judgment the lack of a finding ought not deter this court from affirming the judgment, we now consider the evidence bearing on the matter of value. There is evidence that the book value of the stock was as follows for the five years from 1939 to 1943, inclusive: 1939, $11.06; 1940, $12.34; 1941, $14.19; 1942, $16.13; 1943, $18.24. Apart from evidence of the book value, there was competent evidence of an opinion character that the stock was worth $15 a share. There was evidence of the same type that $10 or less would be a fair price for the stock. There was evidence of an offer by plaintiff and some associates to pay $15 a share for the full 12,460 shares to be issued. There was evidence that Hale bought some 3,000 and more shares of the stock at $12.50 a share in 1940. This involved an instalment purchase over a period of years and contained several protective agreements that might have affected the price paid. In 1943, when the book value was $18 a share some 600 shares of common were sold at $7.25 a share, and 1,583 shares at $10 a share. Plaintiff's offer to purchase at $15 a share was at a time when the stock was carrying a book value of more than $18, and the evidence is subject to some discount as to weight, by the fact that it was conditioned upon the transfer of enough shares to give to him and his associates control of the company; that it occurred pretty shortly before the litigation, and that it involved surrender of pre-emptive rights by other stockholders. If this offer and plaintiff's other offers prove anything it is that plaintiff was able to protect himself by exercise of his pre-emptive rights but we will not press this point.

The foregoing indicates the difficulties of appraising stock in a closely held corporation operating in a fairly limited terri-

tory, and whose securities are not commonly dealt in or listed, so that the value of the stock may be arrived at by ordinary process of trading. Due to the lack of liquidity and the difficulty of estimating its salability it usually sells for less than its book value. As evidence of this, it is to be noted that all of the sales of this stock were at prices materially lower than its book value. Even plaintiff's bid of $15 per share, although it was for a controlling interest, was below the book value by a considerable amount. It is extremely difficult to determine from the evidence what value could be sustained upon the evidence presented in this case. We will not speculate on that matter because we think that the difficulty is deeper than this. The directors had a wide discretion so long as it was honestly exercised. An honest appraisal of the stock by them would discharge their duty. They were not bound to fix a value for the new issue at peril of having a court or expert witness merely differ as to its value. If they acted in good faith they could fix a value in the light of all the circumstances, and unless this is clearly out of line, their discretion would have to be sustained. It is, of course, true that the further out of line the value fixed is in relation to clear factors bearing on value, the stronger and more permissible the inference of bad faith would be. The evidence was that the stock sold for $7, $10, and $12.50 a share. The offer to buy at $15 was for a controlling interest, and the directors could reasonably consider that that indicated a lower value for sale of the stock generally. It is impossible for us to believe that in a situation where there had been current sales of common stock at $7 and $10 the directors can be found to have abused their discretion by fixing $10 as the value of the stock, even though there had been a sale at $12.50 some years before. In this situation the expert evidence that the stock is worth $15, although it is by a competent witness, seems to us not to meet the issue that was before the court which was whether the directors abused their discretion in issuing the stock at $10 a share. It is evident to us that

there was not only room for difference of opinion as to the value of the stock, but also that there were different opinions as evidenced by the sale of the stock for different amounts. We conclude that neither the evidence nor the findings support the judgment on this point.

It is our conclusion that the scheme, including the price at which the stock was sold, does not evidence in itself an abuse of discretion or oppressive or fraudulent action on the part of directors.

Having concluded that there are no findings that there was such a corrupt plan as would render the corporate action void without reference to actual damages sustained by Hale-Haas, and also that, judged on its merits as a scheme, the plan does not so clearly and palpably damage the corporation as to indicate abuse of discretion or bad faith on the part of directors and officers of Hale-Haas, we come to the significance of the finding that Hale purchased preferred stock for an average of $75 and that by the consummation of the scheme the stock would be retired at the call price of $105, to the profit of Hale. Plaintiff contends that this was a wrong to the corporation. If so, it was because the corporation was thereby foreclosed of an opportunity to acquire the stock at less than the call price. The difficulty with plaintiff's contention is that it is not alleged in the complaint that the corporation was in a financial position to purchase its preferred stock or that it was in a position to do so without injury to the stockholders from whom it would buy. So far as we can determine no attempt was made to establish this matter at the trial. It is true that ordinarily a corporation has an implied power to buy its own stock. It is, however, subject to the limitation that it must not do so under circumstances that would constitute a wrong to stockholders or creditors. *Atlanta & Walworth B. & C. Asso. v. Smith*, 141 Wis. 377, 123 N. W. 106. See note, 54 Harvard Law Review, 1191 at 1196. It appears to us to be extremely doubtful whether the corporation could purchase stock from

preferred stockholders at $75, knowing of the imminence of a call at $105, without rendering itself liable to its vendors. Hale may meet that same contention if he is sued by his vendors. If so, it seems clear that he could not successfully defend on the ground that the wrong was to the company. However, aside from that, we do not consider that plaintiff has alleged, proved, or otherwise litigated the point that Hale-Haas was forestalled from purchasing this stock. This being true, whatever wrong there might have been would be to those from whom Hale purchased the stock, and if there was such a wrong, it would be because an insider bought the stock without disclosing inside information as to future corporate action affecting its value. *Nichol v. Sensenbrenner,* 220 Wis. 165, 263 N. W. 650.

The further question arises whether, in view of the fact that the trial court found that the proposals are not "in the interest of Eau Claire Book & Stationery Company and Hale-Haas Corporation or the stockholders thereof, and serve instead the interests of the defendant Earl M. Hale and his creditor, Pedee Investment Company, and constitute a lack of good faith and an abuse of discretion by the directors and managing officers of said corporations" we are bound to treat this as an adequate finding supporting the judgment in and of itself. The difficulty in the present case is that as we examine the record the trial court has found all the evidence from which inferences of bad faith or good faith can be inferred, and whether we treat the general findings as adequate findings of fact, or reject them and go to the evidence in support of the judgment, we are met with the fact that neither is supported by the great weight and clear preponderance of the evidence, let alone the greater degree of proof required in cases where fraud is charged.

We conclude, after a careful examination of the record, that the detailed findings of the trial court do not support the judgment, and that the more general findings and the judgment are

not supported by the evidence. We have studied this case with great concern, and at the request of the court there has been a reargument of certain phases of it. We recognize that the opportunity for oppression and fraud against the minority of a small and closely held corporation are great, and that plans such as this require careful scrutiny. The case has had the attention of an able and conscientious trial judge whose views have the support of a minority of this court. In spite of this, we are persuaded that plaintiff has not established wrong against the corporation, and that the judgment must be reversed. In view of our conclusions, several matters covered in the briefs become immaterial and will not be discussed.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss plaintiff's complaint.

BARLOW, J. (*dissenting*). I am not in disagreement with the majority opinion as to the rules of law applicable to this case, but feel that the facts, which are largely undisputed, sustain the decision of the trial court and that his decision was not against the great weight and clear preponderance of the evidence.

Just prior to the proposed refinancing plan Earl M. Hale, president, director, and majority stockholder of Hale-Haas Corporation, was the owner of 5,370 shares of common stock of the Hale-Haas Corporation, which was pledged as security for a loan of $50,000 with Pedee Investment Company and Drummond Investment Company. He also had voting control of 3,392 shares of the common stock which he had purchased from the Haas estate on a long-term contract, on which he still owed approximately $37,000, the unpaid balance being payable in monthly instalments of $350 per month. If the value of this stock was $10 per share it is evident that he had little or no equity at that time.

The trial court found that at this point Pedee Investment Company was interested in becoming an owner of the common

stock of Hale-Haas Corporation to the extent of $300,000 to $350,000 if the price per share could be agreed upon.

In January, June, and July, 1943, Hale purchased from others 2,183 additional shares of common stock and 1,062 shares of preferred stock of Hale-Haas Corporation. Pedee Investment Company loaned Hale all the money necessary to make such purchases, which were in the total sum of $100,-208.75. On October 15, 1943, all of Hale's loans were consolidated into one promissory note for $150,208.75 to Pedee Investment Company secured by all of his stock except the stock purchased on the long-term contract. At the same time Hale executed and delivered his note to Pedee Investment Company for $1,713.10, covering accrued interest on his indebtedness to date. The court found that at the time these notes were given and the stock pledged for security Hale had no other plan or means of paying these obligations.

The preferred stock of Hale-Haas Corporation was callable at $105 per share, and was purchased by Hale at $75 per share. It is evident the plan was that the preferred stock purchased by Hale was to be called at $105, he being in position to call it, and that in order to call this stock Pedee Investment Company would purchase common stock of Hale-Haas Corporation at $10 per share, thus making a profit to Hale of between $30,000 and $35,000. In fact, a resolution providing for the calling of the Hale-Haas Corporation stock was adopted by the board of directors on October 18, 1943, but the plan was subsequently abandoned when the plaintiff instituted injunctional proceedings.

In the meantime, and on July 22, 1943, the board of directors of Eau Claire Book & Stationery Company, a subsidiary of Hale-Haas Corporation, authorized the retirement of its preferred stock and resolved to borrow from Pedee Investment Company $120,000 payable in six months, for the purpose of calling the preferred stock of Eau Claire Book & Stationery Company, totaling $117,300.

On December 9, 1943, the board of directors of Hale-Haas Corporation authorized the sale of the unissued common stock of the corporation, amounting to 12,460 shares, to Pedee Investment Company at $10 per share, subject to pre-emptive rights, the proceeds to be used to pay the note held by Pedee Investment Company against Eau Claire Book & Stationery Company in the sum of $120,000. At that time plaintiff and other responsible citizens offered to purchase the entire stock issue at $15 per share, which was refused by Hale and other directors, who at that time and at all times thereafter were ready and willing to waive their pre-emptive rights and sell the stock to Pedee Investment Company for $10 per share. Thus we have Pedee Investment Company, which was desirous during this entire period of time to obtain 30,000 or more shares of the common stock of Hale-Haas Corporation, furnishing the funds with which to purchase the outstanding common stock and outstanding preferred stock of Hale-Haas Corporation, which indebtedness it was ready and willing to liquidate by accepting common stock of Hale-Haas Corporation at $10 per share. It would receive 15,000 shares of common stock in liquidation of the Hale indebtedness and 12,000 shares of common stock in liquidation of the Eau Claire Book & Stationery Company indebtedness if the entire plan were carried out. In addition to this Pedee Investment Company, according to the testimony, had agreed to take over the 3,392 shares of stock held by Hale on a long-term contract, for which it would pay $10 per share, thus giving it an additional 3,392 shares.

As a net result of these various transactions Hale would pay his entire indebtedness to Pedee Investment Company and his indebtedness on the instalment purchase of the Hale-Haas common stock from the Haas estate, and would retain a small amount of the common stock of Hale-Haas Corporation. Without the profit made from the purchase of Hale-Haas Corporation preferred stock at $75 and its subsequent calling at

$105 Hale at best could only have liquidated his indebtedness. There can be no doubt that the evidence clearly supports the finding of the trial court that Hale was interested in helping Pedee Investment Company to acquire common-stock ownership in Hale-Haas Corporation, and that his own interests were served in doing so.

With reference to the question of price at which the stock was authorized to be sold, the evidence as to the value of this stock was discussed in the majority opinion. The trial court found the value of the stock to be issued to Pedee Investment Company was in excess of $10 per share. I feel this finding by the trial court means that the excess value was a substantial amount, and the evidence fully sustains this conclusion.

When Hale became majority stockholder and in control of the board of directors, which was only a short time prior to the plan now proposed to be carried out, he advised the stockholders and the board of directors that the preferred stock then outstanding should not be called. When the opportunity presented itself to make a substantial profit by purchasing the preferred stock of Hale-Haas Corporation he apparently changed his mind.

However considered, these facts, in my opinion, constitute a lack of good faith and abuse of discretion by the directors and managing officers of the corporation, which in fact is Hale, as found by the trial court, and the judgment should therefore be affirmed.

I am authorized to state that Justice FAIRCHILD and Justice RECTOR concur in this dissent.