· [No. 31112. Department Two. June 30, 1950.]

*In the Matter of the Estate of* WILLIAM HUTCHINSON COWLES, *Deceased.*

WILLIAM H. COWLES, JR., *et al., as Executors, Appellants*, v. THE STATE OF WASHINGTON *et al., Respondents*.[1]

[1]Reported in 219 P. (2d) 964.

*Witherspoon, Witherspoon & Kelley,* for appellants.

*The Attorney General* and *William C. Klein, Assistant,* for respondent state of Washington.

ROBINSON, J.—On October 5, 1943, William H. Cowles, as owner of certain capital stock in three newspaper corporations, entered into a contract with his son, William H. Cowles, Jr., the managing head of the corporations, by the terms of which he gave the latter an option to purchase two thousand nineteen shares of the capital stock of the Cowles Publishing Company (publisher of the Spokane Spokesman Review) for one hundred thirty dollars per share; two thousand nineteen shares of the capital stock of the Spokane Chronicle Company for one hundred twenty dollars per share; and fifteen hundred shares of the capital stock of the Spokane Engraving Company for ten dollars per share. This included substantially all of the stock of the Spokane Engraving Company, and approximately one-fourth of the stock of the other two companies. The remainder of the stock in these companies was and is owned in its entirety by members of the Cowles family. It is not listed on the market.

The contract provided that the option could be exercised at any time during the three-month period commencing October 1, 1953, and ending December 31, 1953, providing that the optionee, W. H. Cowles, Jr., should have remained actively engaged in the business conducted by the three corporations in an executive or administrative capacity during the period from the date of the contract to and including September 30, 1953. It further provided that, in the event of the death of W. H. Cowles prior to October 1, 1953, W. H. Cowles, Jr., should have the right to exercise the option at any time within twelve months after his father's death, provided that he had met the conditions above set forth until

that time. Should he fail to exercise the terms of the option within the twelve-month period, this was not to affect his right to exercise it during the period from October 1 to December 31, 1953. Consideration for the option was stated to be the sum of ten thousand dollars, paid by W. H. Cowles, Jr., to W. H. Cowles, receipt of which was acknowledged in the contract, and the promise of the former to remain actively engaged in an executive or administrative capacity in the business during the ten-year period above mentioned.

At the time of the execution of this contract, W. H. Cowles was seventy-eight years old. He died testate in Spokane on January 15, 1946. His will provided that the bulk of his estate be placed in trusts, set up for the benefit of his surviving grandchildren, these being the children of W. H. Cowles, Jr., his sister, and his deceased brother. W. H. Cowles, Jr., was named as one of the trustees of these trusts, and the will provided that he should have the right to vote all of the shares of stock of the three companies. W. H. Cowles, Jr., was also named as an executor of the estate. Although he had remained in an executive capacity with the companies until the time of his father's death, he did not exercise the option during the twelve-month period subsequent to that event. Providing he continues in his present position, he will presumably have another opportunity to do so in 1953.

In the meantime, in accordance with the provisions of Rem. Rev. Stat. (Sup.), § 11211 [P.P.C. § 974-53], three appraisers of the estate were duly appointed, respondent Patrick H. Winston being the appraiser recommended by the supervisor of the division of inheritance tax and escheat of the tax commission of the state of Washington. The two other appraisers, being of the opinion that the executors of the estate were required to sell the three newspaper stocks at the option contract values hereinabove set forth, to W. H. Cowles, Jr., if requested, based their appraisal of these stocks upon the said option contract values. Mr. Winston refused to approve this appraisal. He filed separate findings with respect to the general inventory and appraisement, reading, in part, as follows:

"3. That with respect to the value of the 2,019 shares of the Cowles Publishing Company, the 2,019 shares of the Spokane Chronicle Company and the 1,498 shares of the Spokane American Engraving Company inventoried in the above estate, the said Patrick H. Winston makes no separate findings whatsoever upon the grounds and for the reasons that the findings as to the value of such stocks as filed by the other two appraisers is based upon the prices contained in a certain option of October 1, 1943, and that the undersigned appraiser has refused to accept such option prices as determinative of the appraisal value of such stocks and that in order to make separate findings of [sic] any findings whatsoever as to the full value of such stocks it is necessary that the undersigned appraiser and all of the appraisers be provided with the books, records and all other pertinent information with respect to such corporations, and that such books, records and other pertinent information has not been supplied or been made available to the said Patrick H. Winston."

The executors of the estate thereupon petitioned the superior court of Spokane county for a citation directing Mr. Winston to appear and show cause why he should not approve and sign the inventory and appraisement as filed by the other appraisers. An answer was filed by Mr. Winston and by the state of Washington, acting through the supervisor of the inheritance tax division of the tax commission, and this answer included a cross-petition praying the court to issue an order requiring the executors to produce books, records, and other information pertinent to the valuing and appraisal of the stock in question. A hearing was held and an order issued by the court dismissing the petition of the executors, and directing them to provide the appraisers with all "books, records, reports, and other pertinent information of any kind and character whatsoever which may be necessary and reasonable" in making an appraisal of the stock of the three companies. The court specifically found that the option contract was not binding upon the appraisers of the estate in fixing full and fair market values as of the date of the death of the testator. It is from this order that the executors have appealed.

At the hearing, W. H. Cowles, Jr., did not appear, but Mr. A. W. Witherspoon, as counsel for W. H. Cowles, testified that the option agreement had not been drawn up with any thought of tax avoidance. According to his testimony, W. H. Cowles had had certain definite policies as to the management of the Chronicle and the Spokesman-Review which he desired to have continued. It was apparently his feeling that this could best be guaranteed by insuring that his son, W. H. Cowles, Jr., should have a controlling interest in these two papers. W. H. Cowles, Jr., had already purchased one-eighth of the stock therein and held another one-sixth in trust. He further held an option to purchase an additional one-eighth, which was part of the estate of his deceased brother; and by acquiring the one-fourth interest owned by his father, he would hold the controlling interest in the papers. Mr. Witherspoon testified that Mr. Cowles did not wish to will the stock to his son, because that would have been unfair to the rest of his heirs, and hit upon this option plan as a proper solution. It was specified that the period of ten years was fixed in the option contract in order to allow W. H. Cowles, Jr., sufficient time to accumulate funds to exercise his option on the stock in his brother's estate. A set price for the stock was fixed in the option contract so that W. H. Cowles, Jr., could anticipate a definite amount that could be required for him to exercise the option. Mr. Witherspoon testified that he did not recall how this price had been arrived at, and there was no testimony on this point.

Option contracts of the general type here involved are frequently drawn up in connection with closely held businesses. Their use antedates the passage of Federal estate tax laws (Montgomery's Federal Taxes, Estates, Trusts, and Gifts 1948-1949, p. 714), and though they are often drawn up for the express purpose of fixing value for tax purposes (Tarleau, Tax Problems in the Valuation of Property, 25 Taxes, The Tax Magazine (published by the Commerce Clearing House), 520, 522), they are in many cases entered into for motives entirely unrelated to the saving of taxes. Cohen, Restrictive Agreements for Purchase of Stock: Effect on Estate and Gift Tax Valuations, New York Univer-

sity, Fifth Annual Institute on Federal Taxation, p. 54; 2 Paul, Federal Estate and Gift Taxation, 1298, § 18.34. The problem presented by this case—whether the option price should establish the value of the optioned stock for inheritance or estate tax purposes—is not a new one. Unfortunately, in spite of considerable litigation, it is not one to which the courts have found a conclusive solution, and the whole matter is in a state of discouraging confusion. See Paul, Federal Estate and Gift Taxation (1946 Supp.), 785, § 18.34; 2 Bonbright, Valuation of Property, 725. The divergent theories employed by the various courts, Federal and state, in dealing with the matter, and the contradictory results at which they have arrived, are outlined in a note at 5 A. L. R. (2d) 1122, where most of the relevant cases are considered and discussed. No Washington decision involving the point at issue has been referred to us, nor has research disclosed the existence of any.

In general, however, two conflicting solutions to the problem have been found, which, speaking purely for convenience, we may designate as the Pennsylvania and Federal rules. The Pennsylvania rule was set forth in *McLure Appeal*, 347 Pa. 481, 32 A. (2d) 885, as follows:

"Appellant contends that the court, in making its valuation, should have been controlled by the option agreement and refers, in support of the contention, to federal decisions dealing with appraisements of property under the federal estate and gift tax laws. The law requires an appraisement on behalf of the Commonwealth. No agreement by a property owner fixing the value can oust the jurisdiction of or control the Commonwealth's appraisers; such agreement does not create a limitation on the value binding the Commonwealth but it will be considered with the other evidence."

See, also, *Dellone Appeal*, 347 Pa. 486, 32 A. (2d) 888. The opinion of the attorney general of North Carolina, dated February 19, 1940, and reported in CCH, Inheritance, Estate, and Gift Tax Service (1940), par. 8563, reaching the same broad conclusion, is of further interest in this connection. Under this view, the value of decedent's stock for tax purposes will not be controlled by an agreement granting a

legally binding option to sell the stock at death at a price fixed in such agreement.

The Federal rule, on the other hand, has been well stated as follows:

"Where the stock of the decedent in a close corporation or his interest in a business as partner is subject at his death to an agreement of sale or to another's legally binding option to purchase at a fixed price, the fair market value for Federal tax purposes is limited to such price, provided the price was fair at the time it was established and the decedent could not have disposed of the property at any time prior to his death: Helvering v. Salvage, 297 U. S. 106 (1936); Wilson v. Bowers, 57 F. (2d) 682 (CCA-2, 1932); Lomb v. Sudgen, 82 F. (2d) 166 (CCA-2, 1936); Claire G. Hoffman, 2 TC 1160 (1943); Estate of James H. Matthews, 3 TC 525 (1944)." 1 Polisher, Estate Planning and Estate Tax Saving, 311.

This principle has also been adopted by some state courts, which, however, we may note in passing, have death tax laws derived from the Federal estate tax in contradistinction to the inheritance tax statutes prevailing in this jurisdiction. See *Strange v. State Tax Commission*, 192 Miss. 765, 7 So. (2d) 542; *In re Miller's Estate*, 79 N. Y. S. (2d) 372.

The rationale of the Federal rule is roughly as follows: If the option agreement is valid, it is enforceable as a matter of contract law. So long as the option is outstanding, the property involved cannot be sold to anyone for more than the option price, in view of the probability that the optionee will exercise his option. Therefore, the Federal cases suggest, it is illusory to speak of the "market value" as being anything but the option price. In general, this rule is favored by most of the tax authorities and writers who have examined the matter in detail (See Montgomery's Federal Taxes, Estates, Trusts, and Gifts (1948-1949), ch. 14, p. 714; Theodore Ness, Federal Estate Tax Consequences of Agreements and Options to Purchase Stock on Death, 49 Col. L. Rev. 796; Raum, Stock Purchase Agreements Among Stockholders of Close Corporations, N. Y. U. Eighth Annual Institute on Federal Taxation 702); and while most commentators have discussed the problem with reference to the Federal tax, the Pennsylvania rule, as embodied in *McLure Appeal, supra,*

has been criticized by at least one tax expert as unrealistic, particularly where the stock is actually sold, pursuant to the ante-mortem agreement, at the option price. Polisher, Valuation of Business Interests for Federal Estate Tax and Pennsylvania Transfer Inheritance Tax, 48 Dickinson L. Rev. 121, 126.

■ But we need not enter into discussion of the complex technical questions involved, or make a choice between these two rules; for, even if the Federal rule be accepted as a general principle, it cannot be applied here, since the parties to this contract were not dealing at arm's length. Intrafamily sales generally do not give a dependable measure of value because they are not sales in a free and open market. See *Charles W. Heppenstall Sr. Estate*, 1949 P-H T. C. Memo. Dec., par. 49,034, p. 115. If we were to hold that the option price were binding in a case such as this, it would be possible for an owner of stock, wishing to bequeath it to the natural object of his bounty, to achieve the same result by giving the latter an option to purchase the stock upon his death for a purely nominal sum. In this manner, he could, in effect, determine the amount of inheritance tax to be paid. While the point has not always been considered (*Estate of Anna D. Childs*, 1943 P-H T. C. Memo Dec., par. 43, 320, p. 1006, reversed on other grounds, *Commissioner of Internal Revenue, v. Childs' Estate*, 147 F. (2d) 368), that this is a consequence to be avoided has been suggested even in several of the Federal cases, either inferentially (*Commissioner of Internal Revenue v. Bensel*, 36 B. T. A. 246, affirmed 100 F. (2d) 639) or directly (*Claire Giannini Hoffman*, 2 T. C. 1160, 1178, affirmed on other issues, 148 F. (2d) 285, certiorari denied, 326 U. S. 730). See, also, Harriss, Gift Taxation in the U. S., 88; Matthews, Estate Tax Consequences of Agreements for the Sale of a Partnership Interest Effective at the Partner's Death—An Appraisal of the Status of the Law, 26 Tex. L. Rev. 728. It appears to us that to permit such a result would be to sanction a frustration of the policy of our inheritance tax statutes. Consideration has been given to the fact that the option agreement involved in this case provided that the option could be exercised, not only upon the op-

tionor's death, but, should he survive, within ten years of the execution of the agreement. However, in view of the optionor's age at the latter time—seventy-eight—we cannot regard this fact as determinative of the situation.

Appellants contend that a holding that the appraisers are not bound to fix the value of the stock at the price established in the agreement will "abridge the privileges and immunities of the heirs of this estate and of William H. Cowles, Jr., individually, as guaranteed by the 14th Amendment to the Constitution of the United States." We are not in accord. The effect of this entire transaction was to insure the passage of the optioned property to the natural objects of the decedent's bounty, and this would occur whether or not the option was ultimately exercised. It is just such transfers that our inheritance tax laws were designed to reach. Of course, Mr. Cowles' wish to keep his son in control of the family's newspaper business is entirely laudable; but it is difficult to see why a method devised to bring this about should have the effect of limiting his tax liability. Dissenting in the English case of *In re Paulin: In re Crossman*, 104 L. J. K. B. (N. S.) 124, the Master of the Rolls, after observing that the Finance Act, there being construed, expressed the intention "that all property which passes from a deceased person to the hands of another shall contribute its quota to the necessities of the state which has nurtured and preserved it," commented as follows:

"It is not easy to affirm that some private and exceptional method of confining the possession of certain property to members of a family, or the special devices for ascertaining the amount to be paid by one member of that family to another, or another's estate upon his death, ought to be allowed to depreciate the quota to be paid upon that property, which in the hands of the members of the family provides them with an income and wealth that, if measured by the ordinary standards, would reach a figure at least half as high again as that which the family estimate of the sum to be paid allows."

In any event, under our statutes, the business of ascertainment of the market value of property devolves primarily upon the appraisers. Rem. Rev. Stat. (Sup.), § 11211.

None of the cases referred to us, either Federal or state, supports appellants' view that these appraisers, appointed by the court, should be denied access to material which might aid them in determining that value. It may be that, in some situations, the option price fixed in an agreement restricting the sale of stock should establish the market value for tax purposes; the better view would seem to be that the whole matter lies in the realm of fact and is best ascertained upon all the evidence. *Commissioner of Corporations & Taxation v. Worcester County Trust Co.*, 305 Mass. 460, 26 N. E. (2d) 305; *In re Nieman's Estate*, 230 Wis. 23, 283 N. W. 452. Compare *In re Cory's Estate*, 177 App. Div. 871, 164 N. Y. S. 956, affirmed 221 N. Y. 612, 117 N. E. 1065, and *In re Orvis' Estate*, 179 App. Div. 1, 166 N. Y. S. 126, affirmed 223 N. Y. 1, 119 N. E. 88, with *In re Fieux's Estate*, 241 N. Y. 277, 149 N. E. 857; and *Schroeder v. Zink*, 4 N. J. 1, 71 A. (2d) 321, with *Grell v. Kelly*, 134 N. J. Eq. 593, 36 A. (2d) 874. If the executors of an estate feel that proper effect has not been given to a restrictive agreement in the valuation of property which is part of the estate, they may have resort to the courts, as may the state, should it take the position that undue weight has been given to such an agreement. The statute so provides. Rem. Rev. Stat. (Sup.), § 11211. But in the first instance, the appraisers have the right and the duty to consider all factors which may aid them in determining the value of any asset of the estate being appraised. We do not propose to hamper them in the exercise of this function.

The judgment is affirmed.

SIMPSON, C. J., MALLERY, HILL, and HAMLEY, JJ., concur.